[No. C013846. Third Dist. Aug. 11, 1999.]

PETER PATERNO et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants.

[No. C016505. Third Dist. Aug. 11, 1999.]

PETER PATERNO et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

[No. C019267. Third Dist. Aug. 11, 1999.]

PETER PATERNO et al., Plaintiffs and Respondents, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part IV(B).

## COUNSEL

Goldstein & Goldstein, Burton J. Goldstein; Minasian, Spruance, Baber, Soares and Sexton, Michael V. Sexton; Stanley Bell, Sally Bechtold; Thomas K. Caselli; Gordon & Rees, David Collins, Douglas B. Harvey; Desmond, Miller & Desmond, Gary Livaich; Robins, Kaplan, Miller & Ciresi, Stefanie M. Brown, Lynn J. Grano; Kronick, Moskovitz, Tiedemann & Girard and Lloyd Hinkelman for Plaintiffs and Appellants and for Plaintiffs and Respondents.

Daniel E. Lungren and Bill Lockyer, Attorneys General, Robert L. Mukai, Chief Assistant Attorney General, Darryl L. Doke, G. Michael Gates, Seward L. Andrews and Thomas K. McGuire, Deputy Attorneys General; Arostegui, Cooke, Gengler & Jones and G. Steven Jones for Defendants and Appellants and for Defendants and Respondents.

## OPINION

**MORRISON, J.**—Property owners sued the State of California (the State, which includes the Sacramento and San Joaquin Drainage District), Reclamation District 784 (the District) and others no longer in the case, seeking damages after a levee failed. Sample plaintiffs (Paterno) lost on some theories, but won on an inverse condemnation (takings) theory. In related appeals, defendants appeal and Paterno cross-appeals. The takings count must be retried because of changes in the law and because Paterno proceeded on an erroneous legal theory. We uphold the jury's defense verdict on Paterno's theory of dangerous condition of public property. The trial court's refusal to allow the jury to consider a nuisance theory was erroneous

under existing precedent, but Paterno has not shown prejudice. We address a few other issues and reverse with directions.

We have seriously considered the requests by the State and the District that we reverse with directions to enter a defense judgment on the inverse condemnation claim, based on the paucity of relevant evidence in the record and the likelihood Paterno will not prevail. (*Burtis* v. *Universal Pictures Co., Inc.* (1953) 40 Cal.2d 823, 835 [256 P.2d 933]; *Mid-Century Ins. Co.* v. *Gardner* (1992) 9 Cal.App.4th 1205, 1220 [11 Cal.Rptr.2d 918] [party "marshalled the best case it could at trial. Under these circumstances, it is proper for us to direct that judgment be entered in favor of the defendant"].) However, "Unless this court can satisfy itself from the record as to the ultimate rights of the parties, it will not undertake in reversing a judgment to finally settle the same." (*Pollitz* v. *Wickersham* (1907) 150 Cal. 238, 251 [88 P. 911].) As will be shown, Paterno has a long row to hoe before he can prevail, if ever. However, it is possible there are facts which would support a judgment in favor of Paterno; accordingly, it would not be appropriate to end the lawsuit at this time.

The case was protracted and bitterly fought. The procedural details are convoluted but largely unimportant. Because defendants obtained a jury verdict finding no dangerous condition of property and Paterno obtained a court finding of takings liability—*based on the exact same evidence*—the familiar rule that evidence will be viewed in favor of the winning party (*Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157]) operates for and against each side. This apparent anomaly is not unknown. (See *Aetna Life & Casualty Co.* v. *City of Los Angeles* (1985) 170 Cal.App.3d 865, 872 [216 Cal.Rptr. 831] (*Aetna Life*).) Appellate procedural requirements, such as use of headings and citations, must be more strictly enforced as the size of the record grows. (See *Akins* v. *State of California* (1998) 61 Cal.App.4th 1, 17, fn. 9 [71 Cal.Rptr.2d 314] (*Akins*).) Paterno describes the record as "nearly 52,000 pages of appellate transcripts, hundreds of exhibits contributing thousands of additional pages . . . and over 800 pages of briefing." This was before we solicited further briefing from the parties.

FACTUAL BACKGROUND

In the Sacramento Valley, flooding is frequent and severe. (See Field, Personal Reminiscences (1893) p. 13 [1850 flood described by Supreme Court justice].) We recount in *Beckley* v. *Reclamation Board* (1962) 205 Cal.App.2d 734, 739-741 [23 Cal.Rptr. 428], how hydraulic gold mining altered the rivers and valley floor, until enjoined (*Woodruff* v. *North Bloomfield Gravel Min. Co.* (C.C.Cal. 1884) 18 Fed. 753) and regulated. (See *Gray* v. *Reclamation Dist. No. 1500* (1917) 174 Cal. 622, 626-633 [163 P. 1024];

McPhee, Assembling California (1993) pp. 66-67; Holliday, Rush for Riches (1999) pp. 253-299 [describing damage and tracing battle between farmers and miners].) In February 1986, a tropical weather system brought much warm rain, which in turn caused snow melt.

According to a report prepared by the State and introduced into evidence by Paterno, "The major storm that devastated portions of northern and central California in February 1986 was in some ways the greatest storm of record. [¶] Flooding and heavy rains raged through the state for more than a week, from California's north coast to the San Joaquin Valley, causing damage over more than half the state. Much of California received more than half its normal year's supply of rain during the 10-day storm. Bucks Lake in the Feather River Basin received 49.6 inches of rain. [¶] The Governor proclaimed a state of emergency in 39 counties and damages totaled more than $500 million. More than 50,000 people were forced from their homes, and at least 12 people died. An estimated 1,380 homes and 185 businesses were destroyed, and more than 12,000 homes and 950 businesses were damaged."

The Yuba River crested on February 19, 1986, and then receded. The Yuba joins the Feather River near the twin cities of Marysville and Yuba City. At Linda, just upstream of the confluence, a District levee held back the waters.

Generally speaking, the District maintains a number of miles of levees and is funded by assessments from property owners within its boundaries. The Linda levee is within the District, but is also under the jurisdiction of the State, because it is a part of the larger Sacramento River Flood Control Project (Project or SRFCP). "In 1953, the SRFCP works were transferred to the state. A memorandum of understanding confirmed the state's obligation to operate and maintain all completed works of the SRFCP and to hold the federal government harmless. The state turned the levees over to the local district for maintenance and operation but maintained responsibility for the project." (*Akins, supra,* 61 Cal.App.4th at p. 11.) The federal and state governments enforce flood control standards within the Project, including Project levee standards. If a local reclamation district fails to adhere to these standards, the State is obliged to take control. (Wat. Code, § 12878 et seq.) The Linda levee was originally built in 1904 by Yuba County, and transferred to the District, which was formed in 1907-1908. (See *Irvine* v. *Bossen* (1944) 25 Cal.2d 652, 653 [155 P.2d 9].) The Linda levee ultimately became a "Project levee" and was improved by the United States Army Corps of Engineers in 1934 and in 1941.

In the rains of 1955 and 1964, the Linda levee survived waters equal to or exceeding the 1986 levels. Paterno concedes that before the levee, the area

was subject to historic flooding, and states the levee last failed in 1906. Other flooding occurred in 1881 and 1883, partly due to hydraulic mining. (See *Woodruff* v. *North Bloomfield Gravel Min. Co.*, *supra*, 18 Fed. at p. 766.)

Project levees are inspected twice a year by the State. The inspection reports for the levee were consistently favorable, and the Linda levee was given the highest rating—"outstanding"—in the November, 1985 inspection, the last inspection before the flood. But Paterno alleges the Linda levee was riddled with rodent burrows, which encourage boils. A boil results when water is piped from the riverside of the levee to the landside. Some boils simply carry water, but some carry soil with the water, which strips support from the levee. Paterno alleges the Linda levee was sandy and prone to this type of damage and alleges it contained a forgotten concrete pipe and related structures, which encouraged rodent burrows and which could hasten the piping of water and sand from the heart of the levee. As one expert put it, the stream deposits in that area "can deliver large and damaging quantities of water on the land side of levees." Further, a nearby gravel pit (the Speckert Pit) allegedly pierced the subsurface layers and allowed water to flow beneath the levee. The State granted variances to allow deeper digging of the Speckert Pit and later removed a "backfilling" requirement. It appears the area of the pit flooded in the 1955 and 1964 rains, when water backed into it. Paterno produced evidence that water in the pit could flow into "historic channels" at the site of the failure. Paterno alleged the levee was poorly inspected and maintained, with poor rodent and vegetation control practices, and it was not patrolled properly.

On the afternoon of February 20, Eddie Bolton rode his bicycle on the top of the levee and saw boils on the landside. By then the water had receded from a peak of about 76 feet the day before to about 74 feet. The design capacity was 80 feet. Around 5:30 p.m., Bolton reported the boil. About 6:10 p.m., the levee collapsed. The Linda and Olivehurst areas suffered huge losses and there are about 3,000 plaintiffs in this case. According to one estimate, 24,000 people were flooded out in the area and 3,000 homes were damaged.

There was some indirect evidence that the District, which organizes levee patrols, had released the patrollers once the water began to recede, wrongly thinking that the danger had passed. There was testimony that boil repairs were made in the levee, not far from the failure point, in the days preceding the break, but that no records were kept. Paterno produced evidence that by midafternoon on February 20, 1986, boils and seepage would have been visible if anybody had been looking for them, and that the person to whom Bolton reported the boils delayed taking action which could have saved the levee.

There was contrary testimony that there were no signs of danger and that the flood destroyed patrol records. Further, the District trustee assigned to that portion of the levee died before trial, and other witnesses had trouble remembering when they had patrolled. There was expert testimony the levee collapsed due to a sudden, unforeseeable, "hydrofracture" caused by soil compaction within the levee.

DISCUSSION

I. *Inverse Condemnation.*

(I)(A). *Introduction.*

The finding on the inverse condemnation count must be reversed for two reasons. First, the California Supreme Court has changed the factors that must be applied prior to imposing takings liability where damage is caused by failure of a flood control project. Second, the trial court conflated negligent maintenance with a negligent *plan* of maintenance. Takings liability attaches, if at all, only to the latter.

After a six-month trial the jury returned a defense verdict and the trial court immediately announced it had tentatively decided to find takings liability. The parties submitted proposed, competing, statements of decision. The trial court signed a statement of decision which is a near-verbatim copy of Paterno's proposal. We quote the relevant portion:

"THE STATE'S AND RD 784's DESIGN, CONSTRUCTION, MAINTENANCE AND OPERATION OF THE LINDA LEVEE POSED AN UNREASONABLE RISK OF HARM TO PLAINTIFFS AND SUCH UNREASONABLE DESIGN, CONSTRUCTION, MAINTENANCE AND/OR OPERATION CONSTITUTED A SUBSTANTIAL CAUSE OF PLAINTIFFS' DAMAGES

"1. [F]ederal regulations required the Defendants to maintain the Linda levee so as to ensure the levee's serviceability during high water. Federal regulations also required Defendants to continuously operate and maintain the Linda levee so as to provide the maximum benefits . . . .

"2. In February 1986, and particularly on February 20, 1986, the Defendants failed to properly provide for patrols of the Linda levee as required by federal law and by established State and RD 784 standards.

"3. RD 784 supervised and coordinated a patrol plan in February of 1986. This patrol plan did not, as required by federal and state standards, provide patrols of the Linda levee which were continuous, adequately trained and . . . supplied[.]

"4. The State failed to ensure the continuous patrolling of the Linda levee. The State has the overall responsibility for the SRFCP operation and maintenance of the Linda levee. In February of 1986, the State failed to supervise or contact RD 784 to make certain that the District was performing adequate patrols.

"5. The Linda levee was not patrolled on February 20, 1986 by either RD 784 or the State.

"6. The State and RD 784 violated federal and state requirements for maintenance, operation and encroachment control as follows:

"(a) Federal and state requirements for rodent extermination, burrow repair and vegetation control were violated by both Defendants. The State, in addition, violated and failed to properly implement inspection and enforcement procedures required by federal and state law. The State also knew or should have known that its inspection and enforcement procedures did not provide adequate supervision of maintenance and operation of the Linda levee. The Defendants' violations as enumerated above and the State's inadequate supervision, inspection and enforcement of the maintenance and operation of the Linda levee, adversely affected [its] structural integrity[;]

"(b) Federal and state encroachment control requirements were violated by an irrigation pipe buried in the Linda levee near and at the site of the failure, and by a well, standpipe and pump house located on the levee's land side. Defendants failed to inspect for or to remove any of these encroachments, of which Defendants either knew or should have known; and

"(c) The State authorized levee-endangering excavation in the Yuba River channel in violation of federal and state encroachment standards. The State, moreover, granted such authorization over the opposition of its own encroachment control personnel.

"7. The State failed to upgrade the Linda levee notwithstanding extensive urbanization of the area protected by that levee since the levee's construction and inclusion in the SRFCP.

"8. Both Defendants did not act reasonably to avoid unnecessary damage to private property and to provide protection of the public project to the Plaintiffs.

"9. Defendants' failure to provide proper patrols, their failure to conduct the flood fight, their violations of federal and state requirements for maintenance, operation and encroachment control, and their failure to upgrade the Linda levee each individually constituted unreasonable conduct under [*Belair* v. *Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550 [253 Cal.Rptr. 693, 764 P.2d 1070]].

"10. Defendants' unreasonable conduct was a substantial cause of the Linda levee failure. (*Belair, supra,* 47 Cal.3d at [pp.] 565, 568.) The immediate physical cause of the Linda levee failure resulted from boils in, under, on and immediately adjacent to the Linda levee. The boils resulted from rodent burrows, from encroachments within and adjacent to the Linda levee, from previously mentioned excavation in the Yuba River channel and from water flow from the bed of the Yuba River. The evidence shows that the boils could have been detected by levee patrols operating under proper procedure and thus treated and ringed by a flood fight in time to prevent the levee failure. The boils developed, progressed and ultimately caused the levee to fail, and such failure was substantially caused by Defendants' violation of state and federal requirements and regulations for maintenance, operation and encroachment control.

"11. Therefore, as has been described in this section, the Plaintiffs' damages were substantially caused by the Defendants' unreasonable conduct in their design, construction, maintenance, operation and control of encroachments in, under and adjacent to the Linda levee. The mandated procedures, which have previously been discussed and which would further the public purpose of flood control were violated by the Defendants and such violations were unreasonable. Therefore, the Plaintiffs' damages, which were caused by Defendants' unreasonable conduct, constituted a taking and/or damaging . . . for public purpose.

"12. No superseding cause intervened . . . .

"13. There is no justification for Defendants' failure to provide proper patrols, for their failure to conduct a proper flood fight, or for their violation of federal and state requirements for maintenance, operation and encroachment control. There is no justification for the State's failure to upgrade the Linda levee.

"14. The Defendants' taking and damaging of the Plaintiffs' property was not an exercise . . . of police power[.]

"15. The Court has considered and balanced the private damages suffered by the Plaintiffs and the widespread public benefits conferred throughout the State of California by the SRFCP during the high water period of February 1986. Plaintiffs, if uncompensated, would be unfairly and disproportionately burdened with the costs of the SRFCP, which includes the Linda levee, in violation of Article I, Section 19 of the California Constitution."

(I)(B). *Unintentional failure of a levee: Locklin.*

■ The condemnation clause of the California Constitution provides in part that "Private property may be taken or damaged for public use only

when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." (Cal. Const., art. I, § 19.) Where the government damages property without first paying for the right to do so, the owner may sue for inverse condemnation. (*Breidert* v. *Southern Pac. Co.* (1964) 61 Cal.2d 659, 663, fn. 1 [39 Cal.Rptr. 903, 394 P.2d 719].) Generally, when the government takes or damages property, it is strictly liable to pay compensation therefor, unless an exception to strict liability applies. (See, e.g., *Bunch* v. *Coachella Valley Water Dist.* (1997) 15 Cal.4th 432, 439-447 [63 Cal.Rptr.2d 89, 935 P.2d 796] (*Bunch*).) Frequently, damage occurs without an actual intention on the part of the government to harm private property. The California Constitution "never has been interpreted, to impose a constitutional obligation upon the government to pay 'just compensation' whenever a governmental employee commits an act that causes loss of private property." (*Customer Co.* v. *City of Sacramento* (1995) 10 Cal.4th 368, 378, 381-382 [41 Cal.Rptr.2d 658, 895 P.2d 900] (*Customer Co.*) [settled rule "that damage caused by the negligent conduct of public employees or a public entity does not fall within the aegis of section 19"].)

■ When a flood control project fails to function as intended, causing damage to properties historically subject to flooding, strict liability for a taking does not apply. (*Bunch, supra,* 15 Cal.4th at pp. 435-436, 442-451.) Instead, a rule of reasonableness must be applied, as Paterno concedes. This rule arose in *Belair* v. *Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550 [253 Cal.Rptr. 693, 764 P.2d 1070] (*Belair*) and *Locklin* v. *City of Lafayette* (1994) 7 Cal.4th 327 [27 Cal.Rptr.2d 613, 867 P.2d 724] (*Locklin*) and balances the need for flood control projects against the damages occasioned by their failure, by means of weighing a number of specific factors. (*Bunch, supra,* 15 Cal.4th at p. 451; see *Akins, supra,* 61 Cal.App.4th at p. 24.) Here damage was caused by a failure of the levee and the lands were historically subject to flooding, which explains why the levee was built in the first place, above what Paterno calls an "historic Yuba River overflow channel."

Foreseeability does not suffice. "Plan or design characteristics that incorporate the probability of property damage under predictable circumstances may later be judicially described as 'negligently' drawn; yet, in the original planning process, the plan or design with its known inherent risks may have been approved by responsible public officers as being adequate and acceptable for non-legal reasons. For example, the damage, although foreseeable, may have been estimated at a low order of probability, frequency, and magnitude, while the added cost of incorporating minimal safeguards may have been unacceptably high in proportion to available manpower, time and budget. . . . The governmental decision . . . to proceed with the project under these conditions thus may have represented a rational (and hence by

definition non-negligent) balancing of risk against practicability of risk avoidance." (Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, 489-490, fns. omitted (Van Alstyne), quoted and approved in *Bunch, supra,* 15 Cal.4th at p. 450.)

" '[T]he placement, design, and construction of even the most effective system inherently involve a complex balancing of interests and risks. Whatever choice the responsible agency makes will necessarily affect the patterns of flooding in the event the project fails, and will almost certainly increase certain risks in order to reduce others. The dangers posed to individual lands by the failure of any public flood control project are "potentially enormous" and sometimes deserve compensation. However, strict and "open-ended" liability for the failure of a project whose overall design, construction, operation, and maintenance was "reasonable" would unduly deter the development of these vital bulwarks against common disaster. [Citation.]' [Citation.] [¶] [*Bunch*] concluded: 'In the context of inverse condemnation, therefore, a flood control agency does not necessarily exact "disproportionate," and thus compensable, contributions from particular landowners simply because it constructs adjacent flood control improvements that may alter how floodwaters will affect those landowners if the improvements fail to contain the flow. When a public flood control system fails to protect land from historic periodic flooding, the only way to determine whether a damaged private landowner has thereby been forced to contribute a compensable "disproportionate" share of the public undertaking is to determine whether the system, as designed, constructed, operated, and maintained, exposed him to an 'unreasonable' risk of harm, either individually or in relation to other landowners.' " (*Akins, supra,* 61 Cal.App.4th at p. 26, largely quoting *Bunch, supra,* 15 Cal.4th at p. 450.)

The so-called *Locklin* factors are: (1) the overall purpose served by the project; (2) to what extent losses are offset by reciprocal benefits provided by the project; (3) the availability of alternatives to the plan adopted; (4) the severity of the plaintiff's damage in relation to risk-bearing capabilities; (5) the extent to which the damage is a normal risk of land ownership; and (6) the degree to which damage is distributed at large over the project or is peculiar to the plaintiff. (*Bunch, supra,* 15 Cal.4th at p. 446; see *Akins, supra,* 61 Cal.App.4th at p. 26, fn. 18.) When applying these factors, a trial court is reviewing executive and legislative choices about how to spend the People's money, and can impose liability therefor. This power must be wielded with respect for the coordinate branches of government. (See Cal. Const., art. III, § 3.) Some review is required, because liability is provided by the California Constitution, whether in eminent domain or inverse condemnation. (Cal. Const., art. I, § 19, see *Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 346 [144 P.2d 818].) But a judge is ill-equipped to govern, and must defer to

debatable choices. Nothing implicates the heart of a democratic state more deeply than the power to tax the populace and decide what expenditures will best serve the state.

In *Akins*, we considered a case arising from the same series of storms as in this case, but which flooded a different part of the Sacramento Valley. *Akins* followed a bench trial finding takings liability for two classes of plaintiffs: some (Rio Linda) who asserted the State flooded their lands to protect other lands, and some (Strawberry Manor), who claimed the State failed "to have a flood watch plan to close a gap built into a levee, thereby causing a failure in a system designed to protect that territory." (*Akins, supra*, 61 Cal.App.4th at p. 8.) We remanded the portion of the case in favor of Strawberry Manor because the trial court did not consider the later-announced *Locklin* factors in making its finding of unreasonableness, and remanded the rest of the case (Rio Linda) for consideration of the *Locklin* factors if the court found the property was historically subject to flooding; otherwise no showing of unreasonableness was needed to establish liability. (*Id.* at pp. 42-43.)

Here, too, the trial court issued its statement of decision before *Locklin* and *Bunch* were decided. The parties stipulated to amend the relevant complaint to allege unreasonableness in light of *Belair*, but did not have notice of the specific factors later announced in *Locklin*. Counsel herein could not have known the *Locklin* factors would be a required component of the case. The procedural posture of *Belair* did not require explication of reasonableness because the plaintiffs (represented by some of the same counsel as Paterno) insisted they did not have to prove ". . . the levee failure was the result of any act or omission of defendants." (*Belair, supra*, 47 Cal.3d at p. 556.) The new standards apply herein, in accord with general rule of retroactivity. (See *Newman* v. *Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978-984 [258 Cal.Rptr. 592, 772 P.2d 1059].)

The State contends Paterno should not have another chance to prove the *Locklin* factors, because he knew *Belair* made it clear reasonableness was at issue. Paterno claims the defendants "waived" the *Locklin* issue by not raising it at trial. None of the attorneys can be faulted for not foreseeing change in the law. Paterno, as the plaintiff, bore the burden to prove his case, which includes the later-announced standard of liability. To the extent Paterno suggests the issue was waived on appeal because it was not tendered in the initial opening briefs, such procedural point is bootless in light of our order directing supplemental briefing to address the new factors. (See *Walton* v. *City of Red Bluff* (1991) 2 Cal.App.4th 117, 129-130 [3 Cal.Rptr.2d 275].) Paterno also claims the benefit of implied findings, based on the failure to lodge *Locklin* objections to the statement of decision. (See *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800

P.2d 1227].) But again, the burden of proof rested with Paterno, and that burden encompassed proof that the *Locklin* factors favor liability. Reversal is required.

Paterno argues unpersuasively the trial court made findings equivalent to the *Locklin* factors. A review of the statement of decision shows it falls short of the required level of review. ■ A trial court abuses its discretion when it applies the wrong legal standards applicable to the issue at hand. (*Bailey* v. *Taaffe* (1866) 29 Cal. 422, 424; *City of Sacramento* v. *Drew* (1989) 207 Cal.App.3d 1287, 1297-1298 [255 Cal.Rptr. 704].) ■ Here, the correct legal standards were not in existence, hence, the trial court could not have consciously applied them. For example, there is nothing in the statement of decision addressing feasible alternatives, reciprocal benefits, or risk-bearing capacity. While there may be evidence touching on some of the *Locklin* factors in the record, Paterno cannot demonstrate the trial court weighed such evidence in his favor, as the statement of decision does not expressly weigh those factors. The only express balancing of reasonableness occurs in paragraph 15 of the judgment, quoted above, which addresses disproportionality of the costs of the Project. That of itself does not equate with a reasoned balancing of the proper *Locklin* factors. As in *Akins*, ". . . we are not confident the court applied a test comparable to the *Locklin* factors. [Citation.]" (*Akins, supra,* 61 Cal.App.4th at p. 34; cf. *Bunch, supra,* 15 Cal.4th at pp. 453-454 [comparable test employed].)

For guidance, we mention a few points. First, consideration of alternatives to a particular adopted plan requires that such alternatives be *feasible*, which requires a consideration of costs. (*Bunch, supra,* 15 Cal.4th at pp. 451-452 [trial court properly considered "evidence of the District's limited budget and its allocation of funds among all its activities"]; see Van Alstyne, *supra,* 20 Hastings L.J. at p. 491 ["technically and fiscally possible"].)

Second, regarding risk-bearing capacity, Paterno states many plaintiffs incurred "new mortgages and other new debts which they still are paying back today." He looks prospectively, after the flood, rather than before, when a prudent landowner might have bought insurance.

Third, at least since statehood flooding has been a normal risk of land ownership in most of the Sacramento Valley. Paterno argumentatively states that it is inferable "the court did not consider flood damages caused by the sort of outrageous governmental conduct here to be a normal risk of land-ownership." But "damage of the kind the plaintiff sustained" (*Locklin, supra,* 7 Cal.4th at p. 369) was *flood damage*. Paterno claims flood damage "is not a normal risk of land ownership when levees are properly maintained and operated," but this negates his claim, discussed in part II(B), *post,* "An

earthen levee is in danger whenever there is water against it." The *risk* is there whether or not the levee lulls one into a sense of security. Contrary to an implication by Paterno, one needs no "specialized professional knowledge" to know levees break.

However, we agree some reliance on the levee is reasonable and, broadly speaking, it is unfair to allow one portion of a project to deteriorate in favor of others. This assumes a policy decision was made. Van Alstyne, the leading commentator in this field, states that "a deliberate policy decision to shift the risk of future loss to private property owners rather than to absorb such risk as a part of the cost of the improvement paid for by the community at large," meaning private damages, should be treated as a deferred cost of the project as a whole: "If and when they materialize, however, the present analysis suggest that those costs should be recognized as planned costs inflicted in the interest of fulfilling the public purpose of the project[.]" (Van Alstyne, *supra*, 20 Hastings L.J. at pp. 491-492.)

At oral argument Paterno's counsel stated he would not try the case any differently if we remanded the matter. We do not interpret his statement as a concession no further evidence could be brought to bear on the *Locklin* issues. We merely point out some problems with the evidence contained in the current record.

### (I)(C). *Negligent plans of maintenance: Bauer.*

The statement of decision freely mixes concepts of negligence and inverse condemnation. Paterno tried the case on the theory contained within the statement of decision, which he drafted. His main position is that negligent maintenance in aid of a public project is sufficient to establish takings liability. His backup position is that there was one or more negligent plans. At bottom, the trial court adopted Paterno's view *Belair*'s reference to unreasonable conduct meant ordinary *negligence*. But Paterno must prove that an unreasonable *plan* caused the failure. As the Attorney General aptly observes, "An injury resulting from a violation of the project plans is not a result of the 'public use' for which the project was created."

### (I)(C)(i). *Legal Standard of Liability.*

█ The condemnation clause provides in part that "property may be taken or damaged *for public use*," (Cal. Const., art. I, § 19, italics added) and this requires an act of a public body. The focus is on the acts of the public entity, which decides where, when and how to construct public improvements. In making such policy choices, the entity must consider the effect of the improvement on property owners and be prepared to pay for taking or

damaging property, either by condemning it or by paying a takings judgment. Where damage results from the acts of employees, and not from a policy decision, there is no taking. Recovery, if any, lies in a tort action, such as negligence. (See *Customer Co., supra,* 10 Cal.4th at pp. 385, 391-392.) ▮ In the case of alleged shoddy maintenance, as here, it is the *plan* of maintenance which must be unreasonable to establish a taking. Poor *execution* of a maintenance plan does not result in a taking. (*Bauer* v. *County of Ventura* (1955) 45 Cal.2d 276, 285-286 [289 P.2d 1] (*Bauer*); *McMahan's of Santa Monica* v. *City of Santa Monica* (1983) 146 Cal.App.3d 683, 696-698 [194 Cal.Rptr. 582] (*McMahan's*), disapproved on other grounds, *Bunch, supra,* 15 Cal.4th at pp. 447-451.)

The leading case states: "The damage to property in this instance resulted not from immediate carelessness but from a failure to appreciate the probability that, functioning as deliberately conceived, the public improvement as altered and maintained would result in some damage to private property. Damage resulting from negligence in the routine operation having no relation to the function of the project as conceived is not within the scope of the rule applied in the present case. . . ." (*Bauer, supra,* 45 Cal.2d at p. 286, citations omitted, approved on this point, *Belair, supra,* 47 Cal.3d at p. 565; see *Youngblood* v. *Los Angeles County Flood Control Dist.* (1961) 56 Cal.2d 603, 607 [15 Cal.Rptr. 904, 364 P.2d 840].) The "failure to appreciate" the possibility of damage must be on the part of the public entity, not an employee. As then-Justice Traynor put it: "The destruction or damaging of property is sufficiently connected with 'public use' as required by the Constitution, if the injury is a result of dangers inherent in the construction of the public improvement as distinguished from dangers arising from the negligent operation of the improvement." (*House* v. *L. A. County Flood Control Dist.* (1944) 25 Cal.2d 384, 396 [153 P.2d 950] (conc. opn. of Traynor, J.), approved on this point, *Customer Co., supra,* 10 Cal.4th at p. 382; see *Eli* v. *State of California* (1975) 46 Cal.App.3d 233, 236 [120 Cal.Rptr. 63] [no taking, loss "from careless (possibly wilful) error of minor public employees in routine day to day operation"].)

Paterno points to the phrase (from *Bauer, supra,* 45 Cal.2d at p. 286) "negligence in the routine operation having no relation to the function of the project as conceived," and construes it to mean that if there is negligence in the routine operation which *is* related to the function of the project, takings liability attaches. Paterno asserts that "case law merely uses the word 'plan' . . . in the context of a broader inquiry as to whether a defendant inflicted injury through deliberate conduct which ostensibly attempted to further a public project's purpose." *Any act,* he claims, "in direct or indirect furtherance of a project's public purpose" is a "plan" such that an inverse taking results if the act causes damage and is found to be unreasonable, and the

"pivotal requirement under Bauer and its progeny thus is whether the defendants' action related to the purpose of a public project, not whether the action constituted a 'plan.' " He also points to a snippet of discussion about exhibits in the trial court, stating the District conceded that "what they do every year, . . . is a plan," but this is not the law.

To repeat, "deliberate" action invokes takings liability, where, and only where, the deliberation is *by a public entity*, not by an employee: "Damage resulting from negligence in the routine operation having no relation to the function of the project as conceived is not within the scope of the rule applied in the present case." (*Bauer, supra*, 45 Cal.2d at p. 286, quoted in *Customer Co., supra*, 10 Cal.4th at p. 382.)

Paterno misstates the holding of this court's opinion in *Beckley* v. *Reclamation Board, supra*, 205 Cal.App.2d 734, where we explained (*id.* at pp. 752-753) that "Since the complaints here allege deliberate acts of negligence, a cause of action is alleged, irrespective of the questions raised by the 'common enemy' doctrine." The complaints alleged the planned system caused flooding, that the defendants designed and built a weir negligently, causing flooding to lands not otherwise subject to such flooding. (*Id.* at pp. 736-738.) This does not aid Paterno.

Contrary to Paterno's view, *Granone* v. *County of Los Angeles* (1965) 231 Cal.App.2d 629 [42 Cal.Rptr. 34], requires "a plan of construction or maintenance *adopted by a county or flood control district*," (*id.* at p. 646, italics added) not mere negligence by maintenance personnel. The case predicates liability on the construction of "culverts defective in design, in that they had an unnecessarily high propensity to catch and hold debris which obstructed the flow of water," and "the defendants negligently maintained the channel, its levees and culverts, by failing to remove large quantities of debris which reasonably should have been anticipated would collect . . . and obstruct the flow of water." (*Id.* at p. 636.) Language referring to "defective plan and construction, coupled with its negligent maintenance," (*id.* at p. 647) emphasized by Paterno, cannot be read as deciding what is or is not a "plan of maintenance." ■ A case is not authority for points not decided. (*Hart* v. *Burnett* (1860) 15 Cal. 530, 598.)

Similarly, Paterno points to *Ward Concrete Co.* v. *L. A. Flood etc. Dist.* (1957) 149 Cal.App.2d 840 [309 P.2d 546], as "another case which similarly illustrates that <u>Bauer</u> makes the deliberate nature of conduct and its relation to a project's public purpose, not its relation to or technical status as a 'plan,' the determinant of inverse condemnation liability." That case found sufficient evidence of a plan on these facts: The original plan for a drain called for an opening, then the defendant installed a grating. During a rain, the

grating clogged, causing a flood. Plaintiff complained, the defendant left the grating on the drain and another flood ensued. The case emphasized that plaintiff "does not suggest that liability should be fastened on defendant on account of mere negligent operations on the part of its employees," rather "that the obstruction caused by the grating was a part of the construction or maintenance plan adopted by defendant," (149 Cal.App.2d at p. 844) and held: "The installation of the grating was a deliberate act adopted primarily for the purpose of fulfilling the object of the project as a whole and the damage . . . resulted from defendant's failure to appreciate the probability that, functioning as deliberately conceived, the alteration . . . would result in damage[.]" (*Id.* at p. 847.) Paterno extracts from this case the rule that no "plan" is required, but the case did not so hold.

In some cases the distinction is blurred. Paterno quotes a passage of *Aetna Life, supra,* 170 Cal.App.3d at page 874: "All that is required is a deliberate act by a public entity which has as its object the direct or indirect accomplishment of the purpose for which the improvement was constructed and which causes a taking or damaging of private property. [Citation to *Bauer.*]" But the act at issue there, by a public entity, not an employee thereof, was an an unsafe design decision regarding the spacing of power lines, the installation of which made them even more unsafe: "The evidence showed that the lines were deliberately constructed at the greater sag and remained that way through routine semiannual maintenance inspections." (*Ibid.*) This passage does not establish that negligent maintenance in furtherance of the public project suffices.

One case can be read to support Paterno. In *Yee* v. *City of Sausalito* (1983) 141 Cal.App.3d 917 [190 Cal.Rptr. 595] (*Yee*), disapproved on another point, *Bunch, supra,* 15 Cal.4th at pages 433-434, the damage was caused when a gutter ruptured. The defendant argued the complaint alleged mere negligent maintenance. The *Yee* court first pointed out that "The fundamental justification for inverse liability is that the government, acting in furtherance of public objectives, is taking a calculated risk that private property may be damaged. [Citation.]" (141 Cal.App.3d at p. 920.) *Yee* discusses *Bauer, Eli,* and other cases discussing the difference between routine negligence and deliberate acts furthering the project (*ibid.*), then states: "In this case, the public purpose served by the gutter was to collect and convey surface water away from the surrounding residences. The injury occurred while the improvement was operating as intended. There was no evidence that the injury occurred as a result of the use of the improvement for some purpose unrelated to storm drainage, e.g., as a catch basin for the accumulation of debris. [Citation.]" (*Id.* at p. 922.) The *Yee* court went on to distinguish *Hayashi* v. *Alameda County Flood Control* (1959) 167 Cal.App.2d 584 [334 P.2d 1048], where "It was alleged that water and debris

flowed onto [plaintiffs'] lands from a break in a levee constructed and maintained by defendant. Plaintiffs charged defendant with failing to properly clear out the debris and to repair the levee, i.e., negligence. They did not charge that the district caused the break in the levee or that it was a defect in design or construction. [Citation.] Based on this factual record, the *Hayashi* court concluded that plaintiffs merely stated a general tort claim for negligent operation and maintenance. [Citation.] [¶] Unlike the events in *Hayashi*, the damage here was not alleged to be caused by the accumulation of debris; an unintended purpose of the storm drainage system. [Citation.] Rather, appellant asserted that the damage was substantially caused by the water flowing along the rain gutter, uninhibited by debris or foreign objects until it seeped through the gutter . . . ." (*Yee, supra*, 141 Cal.App.3d at pp. 922-923.)

Contrary to the *Yee* court's statement (141 Cal.App.3d at p. 922) that "the improvement was operating as intended," it was undisputed that the damage was caused by a *rupture* in the system. *Yee, supra*, 14 Cal.App.3d 917, has not been viewed by the California Supreme Court as expressing a legal view inconsistent with the view we express: In *Customer Co.*, the court stated "The holding in *Miller*—that damage caused by the negligent conduct of public employees or a public entity does not fall within the aegis of section 19—has been followed repeatedly and uniformly in the more than 60 years that have elapsed since that decision was rendered," (10 Cal.4th at p. 381) citing, among other cases, *Yee*. Thus, to the extent *Yee* may be read to support Paterno's position, we decline to follow it.

Distinguishing between a negligent government *policy* (a plan) and negligent *conduct* by government employees is not unique to condemnation law. (See *Federer* v. *County of Sacramento* (1983) 141 Cal.App.3d 184, 186 [190 Cal.Rptr. 187] [civil rights case must be based on "policy statement, ordinance, regulation, or decision officially adopted and promulgated"].) We reject Paterno's contention that *Bauer* "makes the deliberate nature of conduct and its relation to a project's public purpose, not its relation to or technical status as a 'plan,' the determinant of inverse condemnation liability." Paterno's "technicality" is the adoption by a public agency of a plan, an act of the government body, which is the sine qua non of takings liability. The deliberation must be by the public entity, not a servant.

(I)(C)(ii). *Need for retrial.*

 Having the above standard in mind, the statement of decision cannot stand. It bases liability almost entirely on the violation of standards for levee maintenance, in other words, *departures from the lawful plan,* rather than on an unreasonable plan. Indeed, in the introductory portion to

Paterno's opening brief, he explains that "Because Defendants violated federal law, the Linda levee was in deplorable condition" and goes on to detail the purported violations of levee standards resulting from a "long-standing, deliberate and violative State policy of lax supervision." His case is largely, if not entirely, based on some form of negligence per se, as his citations to Evidence Code section 669 imply.

Even a casual reading of the statement of decision reveals its flaws. The court faulted defendants because they "failed to properly provide for patrols of the Linda levee as required by federal law and by established State and RD 784 standards." This reads as a finding that the plan was not followed, not that the plan was unreasonable. So does the following: "In February of 1986, the State failed to supervise or contact RD 784 to make certain that the District was performing adequate patrols."

The court found the cause of the failure was boils, caused by rodents, encroachments and the Speckert Pit, but "levee patrols operating under proper procedure" could have averted the failure. The stated cause is a failure to follow "state and federal requirements and regulations for maintenance, operation and encroachment control," which is a negligence finding. The issue of causation must be retried.

Because of Paterno's emphasis at trial and on appeal on his negligence-per-se theories, it is difficult to figure out what plans do exist on which he might seek to base liability. At retrial, Paterno will have to identify what alleged plans he relies on, prove such plans were, in fact, adopted by either defendant (see *County of Colusa* v. *Charter* (1989) 208 Cal.App.3d 256, 262 [256 Cal.Rptr. 45] [burden of proof on party relying on ordinance]) and prove the plans contributorily *caused* the flood. Then, and only then, will the trial court have any need to apply the *Locklin* factors, e.g., to determine if the plan was unreasonable because an alternate plan proposed by Paterno was fiscally viable and so forth. The trial court may wish to bifurcate the issues of the existence of relevant "plans" and causation, prior to addressing the *Locklin* issues. (See Code Civ. Proc., § 598.)

Paterno points to seven possibly unreasonable plans in his brief. We address a few points about these tendered plans for the guidance of the trial court. In so doing, we do not mean to imply the existence of any facts assumed by Paterno, as the trial court will be revisiting the facts.

Although Paterno discusses each plan in detail, he summarizes them as follows. "The substantial concurring factors involved, each of which independently supports the findings and judgment below, are: (1) the State's unreasonable levee inspection and rating plan, which approved RD 784's

equally unreasonable flood fight and maintenance plans without knowing what they were; (2) the State's deliberate failure to verify that RD 784 was patrolling levees as required by federal law and State standards; (3) RD 784's grossly substandard and State-approved flood fight plan that left the Linda levee unpatrolled no later than 2:00am on the day that it failed; (4) RD 784's rodent control and vegetation control programs subsumed within its unreasonable maintenance plan blindly approved by the State; (5) a levee-endangering irrigation system on and buried beneath the levee for decades and never removed by Defendants, notwithstanding notice of its existence; (6) the State's failure to upgrade the Linda levee's unreasonable design; and ([7]) the State's authorization of levee-endangering Speckert pit excavation in the Yuba River channel."

(I)(C)(ii)(1). *The State's levee inspection and rating plan.*

The State promised the federal government to oversee the levees ceded to the State. A large part of Paterno's claim is based on his view the State *failed to adhere to its promises*. The trial court (par. 6(a) of the judgment) found "The State, in addition, violated and failed to properly implement inspection and enforcement procedures required by federal and state law," which resulted in a lack of "adequate supervision of maintenance and operation of the Linda levee." Again, this sounds like simple negligence. However, the trial court may have meant the State's *plan* of inspection (frequency or scope) was unreasonable.

At this point we must clarify an error in Paterno's reasoning. He contends federal law required the *State* to inspect the levee every 90 days, and required the establishment of a "permanent committee" with a "Superintendent" to oversee the levees. He contends none of these things occurred. This view results from a misreading of the applicable regulations. Federal law requires "periodic" levee inspections "by the Superintendent" not less than every 90 days. (33 C.F.R. § 208.10(c)(1)(viii) (1998).) It also requires the state to appoint a "superintendent" and "permanent committee" "responsible for the development and maintenance of, and directly in charge of, an organization responsible for the efficient operation and maintenance of" the project. (33 C.F.R. § 208.10(a)(2) (1998).) Our review of the relevant documents shows that the permanent committee is, in fact, Reclamation District 784.

For example, Paterno's exhibit No. 194, the Superintendent's Guide to Operation & Maintenance of California's Flood Control Projects, published by the Department of Water Resources, Division of Flood Management, was "prepared to help supervisory personnel of reclamation districts, levee districts, flood control districts, and other local agencies with flood control

responsibilities *in acting as superintendents of flood control projects in California.*" (Italics added.) It defines "The superintendent of a reclamation district" as distinct from "Personnel of the Department of Water Resources (DWR) who are designated as superintendents," presumably, over those sections of levees the State directly oversees.

Paterno's exhibit No. 174 the Flood Control Project Maintenance and Repair 1985 Inspection Report prepared by the Department of Water Resources in May 1986, begins with the following: "Each spring and fall since 1947, the Department of Water Resources has inspected and rated the quality of maintenance of flood control levees, structures, and channels operated under cooperative State and Federal agreements. . . . This work is part of the process of assurances given by the State to the Federal Government that certain flood control facilities which were constructed by the Department of Army, Corps of Engineers, are properly maintained."

Thus, for many years the State's plan was known to the United States government and there is no evidence of any protest about its adequacy or its conformity with any federal law or regulation. The local reclamation districts can be the "permanent committee" referred to in the federal regulations and they do serve such function.

It is true, as Paterno states, a federal regulation provides "The Superintendent shall provide at all times such maintenance as may be required to insure serviceability of the structures in time of flood," (33 C.F.R. § 208.10(b)(1) (1998)) but to the extent Paterno implies the fact the levee broke means federal supervisory standards must have been violated, he is mistaken. However, he may be able to show the planned *scope* of the inspections were unreasonable under the *Locklin* standards, or the planned frequency was inadequate, which, provided causation is proven, could establish liability.

### (I)(C)(ii)(2). *The State's failure to verify patrols.*

Paterno faults the *State* for failing to verify the District was "continuously" patrolling the levee "as required by federal law and State standards[.]" He claims this was a "deliberate omission" and a "policy decision" by the Department of Water Resources. Paterno urges the State's general supervisory duty over the reclamation districts carried with it the duty to contact reclamation districts to see how the flood fight was going, and "The decision not to verify that proper patrols were occurring was unreasonable under any definition of that concept." Assuming, without deciding, Paterno is correct, and State and federal law required the State to contact the District and the State failed to do so, this is a claim of the failure to implement a plan, not a claim of a bad plan. Even if the State misunderstood its duties, as Paterno supposes, he has not shown the plan was bad.

Within this portion of Paterno's brief is a claim the State failed to provide instruction on flood fighting and failed to provide adequate flood supplies. This claim is waived as it is not embraced by the heading. (Cal. Rules of Court, rule 15(a); *Landa* v. *Steinberg* (1932) 126 Cal.App. 324, 325 [14 P.2d 532].)

### (I)(C)(ii)(3). *The levee patrols.*

Paterno contends "defendants unreasonably failed to provide federally required continuous levee patrols." This, too, is largely a claim of negligence.

Within this claim, however, Paterno alleges the District had adopted an unreasonable patrol plan. Paterno points to testimony about a chart posted on a wall of the District, sometimes referred to in the testimony as a "plan," which supposedly divided the District into five areas and assigned a trustee to oversee each area, based on where each trustee lived. There was testimony the chart was destroyed in the flood and its actual contents are uncertain. In 1957 the District formally adopted a flood plan, written by former trustee and manager, E. Thaddeus Platter. There was no direct evidence the District ever formally adopted the wall chart as a substitute for or amendment to the official plan, although there was some testimony certain interested parties were unaware of the 1957 plan. The record citations Paterno supplies show it was Platter's "understanding [the plan] had been modified," but Platter did *not* testify the wall chart constituted such purported modification. Paterno partly rests this branch of his case on a contention this chart constituted a de facto plan of maintenance which the District followed. Such theory of liability is unsound for the reasons stated: A taking, whether by condemnation or inverse condemnation, must result from the act of a political body in the exercise of its policymaking functions; the actions of workers on the ground, even if the result of a conscious decision to further the project's public purpose by perverting the officially adopted plan, cannot be transmuted into an act of the political body. Even if it had fallen into desuetude, the official plan was still the plan, until formally changed. Paterno will have to prove the chart reflected an actual plan which augmented or superseded the 1957 plan, otherwise no liability will attach therefor.

At oral argument the Attorney General contended all plans pertaining to the levee are compelled by federal and state law, therefore if the District adopted a plan which in any respect departed from higher laws, it was not truly a plan. We disagree. If the District adopted a patrol plan which violated higher law, it would still be an official *plan*, albeit a bad plan.

Paterno also points to a minor aspect of the 1957 plan which arguably departs from the federal regulation requiring during "flood periods the levee

shall be patrolled continuously[.]" (33 C.F.R. § 208.10(b)(2) (1998).) A State manual sets the warning stage for the Feather River at Yuba City at 65 feet. The District's 1957 flood plan called for daily patrols at 60 feet, twice-per-day patrols at 65 feet and continuous patrols at 70 feet. This portion of the District's 1957 plan is arguably less stringent than federal requirements, because the trigger level for *continuous* patrols is higher, although Paterno does not explain the difference, if any, between "warning stage" and "flood periods." Nor does "continuous" necessarily mean some-one had to be on every stretch of every levee at every moment. But Paterno's causation theory is the District released the patrols *too soon*, not that the patrols did not commence before the water reached 65 feet. Accordingly, this alleged flaw seems immaterial.

Paterno makes other allegations about the District's patrol plan, such as the lack of training and supplies. If proven, these points may constitute separate "plans." However, again, he will have to show causation. If, for example, he shows the plans called for an inadequate amount of sand bags, or poor training, these points may be irrelevant if he shows nobody was on the levee when they should have been. And, of course, if the trial court accepts the defense claim of "rapid failure," it may find the presence of patrollers and supplies could not have saved the levee.

### (I)(C)(ii)(4). *The rodent and vegetation control plans.*

If Paterno can show the vegetation and rodent inspection and control plans were unreasonably cursory, they, too, may support liability. This is some-what akin to *McMahan's, supra,* 146 Cal.App.3d 683, where the defendant had a plan to replace old pipes at a rate which guaranteed there would be some failures.

Federal law requires the taking of appropriate rodent extermination "mea-sures," (33 C.F.R. § 208.10(b)(1) (1998)) but does not specify the method to be used in any given area. The federal Standard Operation and Maintenance Manual mentions several methods "such as trapping, baiting, and poison gases, depending on the type of animal present and the time of year the work is done." Vegetation control is the subject of similar standards. (E.g., 33 C.F.R. § 208.10(b)(1) (1998).) Paterno cannot rely on a showing vegetation and rodent control plans were not followed. But he might be able to show there were unreasonable "plans" which sought to implement the regulations. We note the present record contains evidence vegetation not only obscures boils from patrollers, it can contribute to persistent rodent infestations by obscuring evidence of infestation and by providing a suitable biome for rodents, which "prefer areas where a protective cover, such as high grass, weeds and brush, is found."

(I)(C)(ii)(5). *The failure to remove encroachments.*

Paterno alleges the defendants knew or should have known an abandoned piping system was buried within the levee.

The trial court found "Federal and state encroachment control requirements were violated" by these items, which is a negligence finding, but also added that the defendants "failed to inspect for or remove any of these encroachments, of which Defendants either knew or should have known." The Attorney General contends these items could not have contributed to the levee failure, and the federal government was responsible for them. It is not clear what "plan" Paterno can show. However, if he can show the defendants knew about the piping system and chose to leave it in place, he may be able to show a "plan" to accept the risk.

It appears Paterno does not allege this pipe system went *through* the levee; it was *parallel* to the levee. The exhibits suggest it is pipes running from the riverside to the landside of the levee which are of most concern. Paterno's exhibit No. 43, the Standards for Encroachments put out by the Reclamation Board in April 1976, states broadly "Abandoned pipes in the levee section are a threat to the safety of the levee system," but then gives examples of how to eliminate the threat, such as by grouting the pipes. The attached exhibit, Standard Drawing Grouting Abandoned Pipes, clearly shows *through* pipes, not parallel pipes. However, there was testimony parallel pipes within the "prism" of the levee are not allowed. It is possible a parallel pipe system under a levee can weaken it.

(I)(C)(ii)(6). *The State's failure to upgrade the levee.*

The trial court (pars. 7 and 9 of the judgment) found the levee should have been upgraded in light of increased urbanization below the levee. Putting aside the Attorney General's objection this issue exceeds the scope of the pretrial conference order, and putting aside the material omission by the trial court to state what feasible upgrade would have averted the flood, we point out the government need not provide any level of flood protection. (*Tri-Chem, Inc.* v. *Los Angeles County Flood Control Dist.* (1976) 60 Cal.App.3d 306, 312 [132 Cal.Rptr. 142].) It would be an unwarranted usurpation of power for a judge to impose liability for failure to *upgrade* a project, rather than for a defect in the project planned by the executive and legislative branches.

To the extent Paterno suggests an agency is required to continually reevaluate the level of flood protection, citing *Baldwin* v. *State of California* (1972) 6 Cal.3d 424 [99 Cal.Rptr. 145, 491 P.2d 1121], we disagree:

"*Baldwin* involved the California Tort Claims Act and an action for negligence, not inverse condemnation; the issue was whether the design immunity afforded the governmental entity had 'perpetual life.' [Citation.] In rejecting the concept of 'perpetual life,' the court pointed out that 'despite the immunity provided by section 830.6, article I, section 14, of the state Constitution subjects all public entities in California to liability under an inverse condemnation theory for injury to property caused by public works. . . . [W]here property is involved, a public entity is already under a continuing obligation to review the design of its public works in order to avoid liability imposed by article 1, section 14.' [Citation.] [¶] *Baldwin* involved a dangerous condition in a highway, and we doubt that the Supreme Court intended in language that even in that case was dicta to abrogate the traditionally limited duty of the government to make flood control improvements. [Citation.]" (*Tri-Chem, Inc.* v. *Los Angeles County Flood Control Dist., supra,* 60 Cal.App.3d at p. 314, italics omitted.) Where channels are dug, there *is* "a continuing obligation to monitor a risk created by the public entities." (*Akins, supra,* 61 Cal.App.4th at p. 41, fn. 37 [contrasting *Tri-Chem*]; *Locklin, supra,* 7 Cal.4th at p. 379 (conc. opn. of Mosk, J.) [alteration of drainage should create duty to monitor impact of runoff as urbanization occurs].) This does not create a duty to beef up a levee system. (See *Akins, supra,* 61 Cal.App.4th at pp. 46-47 [contrasting cases where flooding occurs *in spite of* flood projects].) Such a duty would make flood control projects insurers against floods, a result eschewed by the California Supreme Court. (*Bunch, supra,* 15 Cal.4th at p. 454; *Belair, supra,* 47 Cal.3d at p. 565.)

The Attorney General properly observes liability based on a failure to upgrade "places the determination of a project's scope in the hands of those who have caused the protected area to be more extensively used, rather than in the hands of the public entities and elected officials charged with that determination." He also observes flood concerns invoke competing public interests (witness the decades-long Auburn Dam debate, lately reanimated by competing flood control proposals) and continues, with considerable understatement, "Whether [resolution of such concerns] should be achieved by building more dams, bigger levees, restricting development in high risk areas, or some other means, however, has not been assumed by the courts as within their province to decide." We agree. Judges do not decide where to build dams and levees, nor how high.

Paterno's argument also ignores the passage of Van Alstyne, approved in *Bunch,* to the effect the reasonableness calculus must be made as of the time the public entity is making the decision, for example, to erect an 80-foot levee, instead of a 90-foot levee. (Van Alstyne, *supra,* 20 Hastings L.J. at pp. 489-490, quoted and approved in *Bunch, supra,* 15 Cal.4th at p. 450.)

An acontextual reading of *Odello Brothers* v. *County of Monterey* (1998) 63 Cal.App.4th 778, 790-792 [73 Cal.Rptr.2d 903], can be taken to support the imposition of liability when an agency considers but rejects an upgrade. The case arose on summary judgment. The defendant breached a levee in order to flood the Odello lands and save other lands, but refused compensation because of a purported emergency. But the emergency was caused by known inadequacies in the defendant's levee system. The facts showed a deliberate effort to disregard a risk so by use of an emergency declaration, the defendants could damage the Odello lands for free, instead of paying for the policy decision to flood some lands in order to save others. Those facts are so different the decision is of no aid to Paterno. Accordingly, we express no view on the holding of the case.

### (I)(C)(ii)(7). *The Speckert Pit.*

The trial court found the "State authorized levee-endangering excavation in the Yuba River channel in violation of federal and state encroachment standards." This statement is technically incorrect, because the federal and state procedures contemplated variance upon a proper showing, and the necessary variances were obtained. But the acts of approving the pit and eliminating the backfilling requirement may constitute plans.

In this connection we observe the State has pointed out a potential flaw in Paterno's evidence of causation: Paterno's expert did not compare the effect of the pit as dug (with a variance) and a hypothetical pit for which a variance (for deeper digging) would not have been needed, only the effect of a pit as dug with no pit. Further, it does not appear there was any evidence the backfilling would have been completed before the flood, if the "backfilling" requirement had not been eliminated. If this is so, the elimination of the backfilling requirement becomes a red herring: What is significant is the authorization of the pit itself. If Paterno can prove the pit pierced an impermeable subsurface layer that channeled water, which in turn undermined the levee, his claim seems viable. Allowing the opening of an underground channel seems analogous to planning to leave a gap in a levee, as in the *Akins* case.

The Attorney General maintains the only concern about the pit was the creation of a secondary river channel and Paterno cannot show the encroachment provisions "were designed to prevent a phenomenon theorized by plaintiffs' expert to have resulted in boils on the landside of the levee," namely, the " 'artesian pressure' effect theorized by plaintiffs' expert." Just so: Paterno claims approval of the pit endangered the levee in a way not adequately valued by the planners.

(I)(D) *Conclusion as to Inverse Condemnation.*

Our conclusions above require a complete retrial on all issues of the takings count, including the cause or causes of the levee failure and the existence, *vel non*, of relevant plans. For the reasons stated in part (IV)(B) the retrial will be before a new trial judge. The new judge has discretion in bifurcating issues and accepting evidentiary stipulations. The new judge may choose to try the issue of causation first, for if none of the tendered plans *caused* the flood, the case is over. Or, the issue of the existence of certain tendered plans may be appropriate for summary adjudication. The parties may stipulate to present the testimony of some (or all) witnesses by lodging transcripts of the first trial, supplemented by other evidence as necessary. Further, the parties may conclude some issues which were developed at trial solely for the edification of the jury can be stipulated to before the trial judge. These and other techniques developed by counsel and the trial court should ensure the subsequent trial is not as protracted as the first trial.

II. *Dangerous condition of public property.*

The jury returned a defense verdict on a count alleging defendants maintained a dangerous condition of public property. We reject two challenges to this verdict and sustain it.

(II)(A). *Composition of the jury.*

Paterno contends the trial court erroneously denied his challenge for cause as to jurors employed by the State or married to State employees because they stood "in the relation of . . . master and servant, employer and clerk, . . . principal and agent" of a party. (See Code Civ. Proc., § 229, subd. (b).)

Paterno did not exhaust his peremptory challenges. ■ He concedes to preserve a claim of error in denying a for-cause challenge a party must either exhaust his challenges or justify failing to do so. (*Kimbley* v. *Kaiser Foundation Hospitals* (1985) 164 Cal.App.3d 1166, 1169 [211 Cal.Rptr. 148].) He argues his failure to do so is justified because there were more "pro-State" prospects waiting in the venire and if he challenged State employees in the box he might have ended up with a more biased jury. Paterno points out various negative attributes of other venirepersons, but does not demonstrate where or how this alleged problem was brought to the attention of the trial court. "We do not, however, accept such after-the-fact justifications for a defendant's failure to exercise all peremptory challenges when, as here, the defendant offered no such justification at trial." (*People* v. *Fairbank* (1997) 16 Cal.4th 1223, 1239 [69 Cal.Rptr.2d 784, 947 P.2d 1321].) Paterno's

remedy was to exhaust his peremptories and press his argument on appeal, or make a record in the trial court, not gamble on a favorable result at trial.

### (II)(B). *Sufficiency of the evidence.*

■ Paterno contends no substantial evidence supports the verdict. The Attorney General construes Paterno's brief in part as an attack on the verdict form, based on Paterno's quibble over whether the special verdict should have clarified whether the "way" the injury occurred needed to be foreseen or only the "kind of injury." Because Paterno did not head any claim regarding the verdict form, and disavows such claim in his reply brief, we do not address the point.

The special verdict answers four relevant questions: The State and the District owned or controlled the levee; the levee was "in a dangerous condition" the day it failed; the dangerous condition was "the legal cause" of Paterno's damages; and, fourth, Paterno's injuries *did not* occur "in such a way which was reasonably foreseeable as a consequence of the dangerous condition of the Linda levee[.]"

Paterno repeatedly states he won what he characterizes as a severable verdict on causation. Thus, Paterno claims, regarding the defense theory of rapid failure of the levee, that "The jury's causation verdict for Plaintiffs rejected Defendants' argument[.]" But the verdict means no more than the defects in the levee caused the failure and flood. There was no severable finding to the effect the defendants *caused* the levee failure.

We agree flooding is a foreseeable consequence of a levee break, but this masks the relevant inquiry, which is whether the dangerous condition of the levee was the proximate result of any negligence on the part of either defendant. In other words, once the levee broke with high water against it, flooding was foreseeable. But was it foreseeable that the levee would break at all? Paterno dismisses the defense evidence regarding a "rapid failure" scenario, citing to cases emphasizing a plaintiff need not establish the exact injury was foreseeable. (See *Taylor* v. *Oakland Scavenger Co.* (1941) 17 Cal.2d 594, 600 [110 P.2d 1044].) Paterno's authorities involve supervening negligence, which assumes negligence has been established. (See *Akins* v. *County of Sonoma* (1967) 67 Cal.2d 185, 199 [60 Cal.Rptr. 499, 430 P.2d 57].) The jury may have concluded the dangerous condition of the levee was wholly unforeseeable, not attributable to any negligence on the part of either defendant. Nothing in the cases cited by Paterno relieves the plaintiff of establishing the proximate *cause* of the harm is foreseeable. Therefore defendants' "rapid failure" theory was appropriately submitted to and resolved by the jury.

The jury could have concluded the dangerous condition was not "created by the negligent act or omission of a defendant" as it was instructed, and instead found a levee is in danger whenever water lies against it. The District's 1957 flood plan begins: "An earthen levee is in danger whenever water is against it." Paterno argued this point to the jury. He linked it to the verdict form as follows: "Question two. Was the Linda levee in a dangerous condition on the date of the break? Remember Mr. Harvey and I both brought out the standard manual and [the District's] flood fight manual. A levee is in danger whenever water is against it. And it gets more dangerous the longer water is up against the levee." The jury could accept Paterno's theory, answering the levee was in a "dangerous condition" on the verdict form, and still rationally find the failure was not the fault of defendants, because it was not foreseeable. In so doing, the jury could have rejected Paterno's claims of undetected seepage, boils and other theories of failure, though Paterno had invited the jury to consider those dangers as well.

Rather than discussing the evidence of the "rapid failure" theory, Paterno simply argues there is no evidence "property damage and personal injuries were unforeseeable consequences of flooding resulting from levee failures." Paterno does not discuss the evidence regarding *foreseeability of a flood* nor the evidence supporting the defense theory of a "rapid failure." Paterno has waived his substantial evidence claim to that extent. (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) We know the Attorney General and the District presented evidence of rapid failure. Defense experts opined the failure was due to "hydrofracture," not piping, which means "the surface does have a layer of clay material on top of it, which doesn't allow water to get to the surface, so pressure in the water builds up until it can cause a fracture through this layer of soil above the sand, and then once it starts going it can remove material very fast," "It was . . . a very rapid failure of the levee itself." One expert pointed to an "oxbow" in the river reflected on an 1860 map, which resulted in "clay enrichment within the hydraulic mining debris," leading to a pressure point or "lens" in the levee. Such "hydrofracture" was not predictable because "at the time of levee break at Linda in 1986, to my knowledge, there had been no analysis of any levee for hydrofracture" and "the intricate differences between piping and hydrofracture was not known" and such failure can occur quickly. Paterno claims this evidence "was irrelevant to the issue of reasonable foreseeability of the kind of injury suffered," but it is Paterno who focuses on irrelevant matter by resting his case on the unremarkable point that if a flood occurs, damage is foreseeable.

In his reply brief Paterno maintains his "initial brief anticipated and amply rebutted Defendants' evidentiary arguments, [so] no further extended rebuttal is necessary." It was not the obligation of the defense to show there was

evidence supporting foreseeability. The obligation was on Paterno, as the appellant on this branch of the appeal, to establish in his opening brief that there was not, by fairly setting forth the evidence. "Instead of a fair and sincere effort to show that the trial court was wrong, appellant's brief is a mere challenge to respondents to prove that the court was right. And it is an attempt to place upon the court the burden of discovering without assistance from appellant any weakness in the arguments of the respondent. An appellant is not permitted to evade or shift his responsibility in this manner." (*Estate of Palmer* (1956) 145 Cal.App.2d 428, 431 [302 P.2d 629]; see *Foreman & Clark Corp.* v. *Fallon, supra,* 3 Cal.3d at p. 881.) Paterno's purported attack on the defense evidence in the reply brief comes too late. (*Kahn* v. *Wilson* (1898) 120 Cal. 643, 644 [53 P. 24].) Further, it is no more than a rehash of arguments about the strength of the evidence, which is not open on appeal. (*Bancroft-Whitney Co.* v. *McHugh, supra,* 166 Cal. at p. 142.)

Contrary to Paterno's view, the defendants were not obliged to appeal from the jury's causation verdict in Paterno's favor because, as stated, no such verdict exists.

### III. *Nuisance.*

■ Late in the trial the court reconsidered previous rulings and granted a directed verdict against Paterno on a nuisance count. ■ "This power exists in favor of the defendant where there is no substantial evidence tending to prove all the controverted facts necessary to establish the plaintiff's case." (*Estate of Sharon* (1918) 179 Cal. 447, 459 [177 P. 283].)

■ The relevant part of the complaint alleges: "To the extent that defendants allowed the waters contained within the channel of the Yuba River to escape at less than the design capacity . . . the maintenance of said levee system constituted a nuisance. . . . Defendants used and maintained their property and operated the levee system in such a manner as to constitute a nuisance . . . in that vast quantities of water were caused to be released onto plaintiffs' properties . . . ."

Contrary to an assumption by Paterno, the record does not reflect the basis of the ruling. The trial court grounded its ruling on page "384 which is quoted and on that basis only" of a given case. The page cited mentions two different theories, each of which was tendered by the defense; the written order does not clarify the matter. In any event, we review the judge's ruling and not his reasoning. (*Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].) We conclude the trial court erred under existing law. However, Paterno has not carried his burden to show prejudice. Accordingly,

we need not decide whether liability in nuisance based on the failure of a flood control project would be eliminated or tempered by the policy considerations which caused the California Supreme Court to temper strict liability in the takings arena for flood projects.

(III)(A). *Duplicative counts theory.*

The Attorney General properly concedes "the consequences of a dangerous condition [of public property] may create an interference with property rights which also falls within the definition of 'nuisance,' " but "submits the Legislature did not intend the carefully drawn provisions of the [California Tort Claims Act] to be ignored by relabeling the claim." Thus, "a nuisance cause of action cannot be substituted for a dangerous condition of property cause of action where the cause of the 'nuisance' is a dangerous condition of public property[.] [T]he cause of action must stand or fall under the dangerous condition statutory provisions if the purposes of the Tort Claims Act are to be met." The Attorney General raises an important policy issue, but should direct it to "the other side of Tenth Street, in the halls of the Legislature." (*Osborn* v. *Hertz Corp.* (1988) 205 Cal.App.3d 703, 711 [252 Cal.Rptr. 613].) We do not make public policy.

"Anything which is injurious to health . . . or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . is a nuisance." (Civ. Code, § 3479.) Paterno pleads a nuisance by the flooding of his lands. Nuisance claims based on a single instance of flooding are not unknown. (E.g., *Ambrosini* v. *Alisal Sanitary Dist.* (1957) 154 Cal.App.2d 720, 727 [317 P.2d 33].)

The California Tort Claims Act bars liability against public entities "Except as otherwise provided by statute[.]" (Gov. Code, § 815.) The act provides liability for a dangerous condition of public property. (Gov. Code, § 835.) But the California Supreme Court has held Civil Code section 3479 is a statute that provides liability against public entities which maintain nuisances. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 932-937 [101 Cal.Rptr. 568, 496 P.2d 480].)

With undue qualification, a leading treatise states: "If the facts warrant, *it appears* that a plaintiff may sue for damages based on a dangerous condition of real property [and nuisance] arising from the same condition, although design immunity . . . may bar relief if its elements are established by sufficient evidence. [*Citations.*]" (Van Alstyne et al., Cal. Gov. Tort Liability Practice (Cont.Ed.Bar 1992) General Liability and Immunity Principles, § 2:106, p. 195, italics added.) The qualification we italicize is based on an anomalous decision, *Longfellow* v. *County of San Luis Obispo* (1983) 144

Cal.App.3d 379 [192 Cal.Rptr. 580] (*Longfellow*), which, in an alternate holding, concluded that if a count may be stated for a dangerous condition of public property, the same facts cannot be used to allege a nuisance count. (*Id.* at p. 384.) This does not follow logically. ▮▮▮ That a given set of facts fortuitously supports liability on two legal theories is not a principled reason to deny a party the right to pursue each theory. (See *Pfleger* v. *Superior Court* (1985) 172 Cal.App.3d 421, 429-432 [218 Cal.Rptr. 371] (*Pfleger*) [criticising *Longfellow*].)

The Attorney General points to *Mikkelsen* v. *State of California* (1976) 59 Cal.App.3d 621 [130 Cal.Rptr. 780], which held that where a nuisance cause of action was based on negligent plan or design, the design immunity provision of the California Tort Claims Act barred it. There is no claim of statutory immunity raised in this case. Reliance on *Mikkelsen* is unavailing.

(III)(B). *Statutory duty theory.*

▮▮▮ The District points to Civil Code section 3482, which provides: "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." We agree "It is the responsibility, liability and duty of the reclamation districts . . . to maintain and operate the works of the project," (Wat. Code, § 8370) however, " 'A statutory sanction cannot be pleaded in justification of acts which by the general rules of law constitute a nuisance, unless the acts complained of are authorized by the express terms of the statute under which the justification is made, or by the plainest and most necessary implication from the powers expressly conferred, so that it can be fairly stated that the legislature contemplated the doing of the very act which occasions the injury.' [Citation.]" (*Hassell* v. *San Francisco* (1938) 11 Cal.2d 168, 171 [78 P.2d 1021].) Where an improvement is erected *improperly*, it cannot "be fairly stated that the legislature contemplated the doing of the very act" causing damage. (See *People* v. *Glenn-Colusa Irr. Dist.* (1932) 127 Cal.App. 30, 36 [15 P.2d 549].) No statute commands or permits rodent burrows, buried pipes and so forth.

(III)(C). *Lack of control theory.*

The District purports to raise another defense, that it lacked ownership or control of the levee and therefore is not liable for a nuisance. This point is waived because it was not separately headed as an argument. (Cal. Rules of Court, rule 15(a); *Landa* v. *Steinberg*, *supra*, 126 Cal.App. at p. 325.) Further, the District's eponymous purpose is to reclaim the land, which it does by collecting assessments from property owners and maintaining levees.

(III)(D). *Prejudice.*

 Paterno has shown error, but makes little effort to show prejudice. The conclusory claims he does tender do not persuade. Accordingly we find the error harmless.

 "No judgment shall be set aside . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.)

This provision "is amplified by Code of Civil Procedure section 475, which states that trial court error is reversible only where it affects '. . . the substantial rights of the parties . . . ,' and the appellant 'sustained and suffered substantial injury, and that a different result would have been probable if such error . . . had not occurred or existed.' *Prejudice is not presumed, and the burden is on the appealing party to demonstrate that a miscarriage of justice has occurred.* [Citations.] . . . [¶] . . . When the trial court commits error in ruling on matters relating to pleadings, procedures, or other preliminary matters, reversal can generally be predicated thereon only if the appellant can show resulting prejudice, and the probability of a more favorable outcome, *at trial.* Article VI, section 13, admonishes us that error may lead to reversal only if we are persuaded 'upon an examination of the entire cause' that there has been a miscarriage of justice. In other words, we are not to look to the particular ruling complained of in isolation, but rather must consider the full record in deciding whether a judgment should be set aside." (*Waller* v. *TJD, Inc.* (1993) 12 Cal.App.4th 830, 833 [16 Cal.Rptr.2d 38], first italics added (*Waller*).)

 There are few types of error which are categorically reversible or reversible per se. "Notwithstanding an abundance of authority going to an explanation and construction of this constitutional provision, from necessity its application depends upon each particular case as it arises." (*Gee* v. *Fong Poy* (1928) 88 Cal.App. 627, 646 [264 P. 564]; see *Herbert* v. *Lankershim* (1937) 9 Cal.2d 409, 416-417 [71 P.2d 220].) "[W]e have the power to review conflicting evidence for the purpose of ascertaining whether or not an error 'has resulted in a miscarriage of justice.' It is indeed made our duty to do so, and the further duty is imposed to disregard a manifest error when, upon such examination, we shall not 'be of the opinion that the error complained of has resulted in a miscarriage of justice.' It is no longer the case that injury is presumed from error; the injury must appear affirmatively to the mind of the court after the examination required, or from the nature of the error itself. [Citation.]" (*Vallejo etc. R. R. Co.* v. *Reed Orchard Co.* (1915) 169 Cal. 545, 554 [147 P. 238].)

But our duty to examine the entire cause arises when and only when the appellant has fulfilled his duty to tender a proper prejudice argument. Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice. (*Vaughn* v. *Jonas* (1948) 31 Cal.2d 586, 601 [191 P.2d 432]; *Waller, supra,* 12 Cal.App.4th at p. 833; *Santina* v. *General Petroleum Corp.* (1940) 41 Cal.App.2d 74, 77 [106 P.2d 60] ["Where any error is relied on for a reversal it is not sufficient for appellant to point to the error and rest there."].)

■ Paterno tenders no developed prejudice argument. He simply asserts nuisance is easier to prove because it does not require proof of negligence, but he does not analyze this bald assertion with reference to the particular nuisance alleged or to facts of this case. Contrary to his claim in the reply brief, the defendants have not conceded prejudice. It is *Paterno's* duty to show prejudice. He does not explain what instructions might properly have been given, nor how they would have differed from those given on the dangerous condition theory, except for asserting, by implication, negligence would not have been a required element. He has not identified what elements *would have been required,* nor has he explained what evidence in the record would have supported the theory.

■ An appellate court is not required to examine undeveloped claims, nor to make arguments for parties. (*People* v. *Gidney* (1937) 10 Cal.2d 138, 142-143 [73 P.2d 1186].) However, generously construed, Paterno's brief does make a tangible argument that the error was categorically reversible because, *as a matter of law without reference to the particular case,* nuisance is easier to prove than negligence. We reject this argument.

Paterno's "primary right" to enjoy property was impaired by flood waters. He properly pleaded nuisance and negligence theories predicated on the same operative facts in aid of his cause of action. (See *Slater* v. *Blackwood* (1975) 15 Cal.3d 791, 795-796 [126 Cal.Rptr. 225, 543 P.2d 593].) He was given a trial on his *cause of action,* which was submitted to the jury on the dangerous condition theory.

The error is the jury was not permitted to consider another theory. This is analogous to a claim the jury was not *instructed* on that theory. ■ There is no per se reversal for instructional error in civil cases, as explicated in *Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548 [34 Cal.Rptr.2d 607, 882 P.2d 298], which rejected a claim that "erroneous denial of instructions explaining a 'central theory' of a party's case is prejudicial as a matter of law." (8 Cal.4th at p. 573.) "[A] substantial body of California decisions recites that the erroneous denial of correct specific instructions covering a civil litigant's supportable 'theory of the case' is

'inherently' prejudicial. . . . [T]his principle has been stated, or at least implicitly applied, in a wide variety of situations, ranging from the *complete preclusion of a claim or defense* [citations] to mere lack of specificity in relating correct general principles to the particular facts [citations]." (*Id.* at pp. 574-575, italics added.) "The rationale generally given is that an error of this nature prevents jury consideration of the omitted 'theory' and thus denies, to that extent, the right to a jury trial." (*Id.* at p. 575.)

■ Although *Soule* involved instructional error, the effect of the court's rejection of per se reversal in cases where a party has been deprived of a jury trial on an omitted theory is the same: The party must articulate prejudice specific to the particular case and cannot rely on a simple showing of error; nor is the denial of a hearing on that theory necessarily reversible error. For example, in *some* cases it can be shown that a jury's verdict on one theory negates an element of another theory (e.g., *Hillman* v. *Garcia-Ruby* (1955) 44 Cal.2d 625, 627-628 [283 P.2d 1033]), and in others, no substantial evidence supports an omitted theory. The later point is shown by *Tanforan* v. *Tanforan* (1916) 173 Cal. 270 [159 P. 709]. Here, Paterno claims the court directed a verdict because the counts were duplicative. In *Tanforan*, the trial court forced the plaintiff to elect between inconsistent theories pleaded in separate counts. There, as here, the effect was to preclude consideration of a proper legal theory of recovery. But the court affirmed, finding the error harmless because the facts did not support the omitted theory. (*Id.* at pp. 273-274.)

Thus error in eliminating a legal theory from a case is not categorically reversible. ■ "We are not persuaded . . . by earlier pronouncements that certain kinds of erroneous instructional omissions in civil cases are automatically reversible because they violate a litigant's right to jury trial. In our view, if a civil litigant was permitted to introduce evidence, cross-examine witnesses, and present argument before a fairly selected jury that rendered its honest verdict on the trial record, there has been no 'structural [defect] in the constitution of the trial mechanism' that might call for automatic reversal of a civil judgment without consideration of actual prejudice." (*Soule* v. *General Motors Corp., supra,* 8 Cal.4th at p. 579; see *People* v. *Breverman* (1998) 19 Cal.4th 142, 177 [77 Cal.Rptr.2d 870, 960 P.2d 1094] [In criminal case, "A different result cannot be reached by characterizing the error as the denial of the defendant's 'fundamental' right to a jury determination of all the material issues, then reasoning that an appellate court's determination of harmlessness on the evidence cannot cure the deprivation."].) The California Supreme Court thus rejects the idea that denial of a hearing on a valid theory compels reversal in all cases. (See also *People* v. *Flood* (1998) 18 Cal.4th 470, 482-490 [76 Cal.Rptr.2d 180, 957

P.2d 869] [jury directed to find an element of a criminal offense to be true, held, error was subject to harmless error analysis].)

In any event Paterno does not even make that argument. Instead he argues a nuisance case would have been easier to win because negligence would not have to be proved. As to *that* argument, Paterno has failed to identify the elements of nuisance, the evidence relevant to such claim or the appropriate instructions. All Paterno does is provide quotations to the effect that nuisance does not require proof of negligence. That sort of claim is no substitute for a prejudice analysis, because it does not answer the constitutionally compelled question facing an appellate court, namely, assuming there was error, so what? Further, Paterno has wrested this generality from its context.

Because Paterno does not claim the defendants breached the levee, nor that it was ultrahazardous, his claim *does* rest on negligence. (See *Tint* v. *Sanborn* (1989) 211 Cal.App.3d 1225, 1228 [259 Cal.Rptr. 902].) In claiming negligence is not required, Paterno cites pages from the Van Alstyne article which *impair* his claim: "[W]hen the escaping water is not attributable to some inherent risk of the project as planned, but results from an unexpected deficiency in its practical operation, a specific factual showing of fault may be necessary . . . ." (Van Alstyne, *supra*, 20 Hastings L.J. at p. 465, fns. omitted.) Paterno also cites a case which plumbs the relationship between nuisance and negligence: " 'The invasion may be intentional and unreasonable. It may be unintentional but caused by negligent or reckless conduct; or it may result from an abnormally dangerous activity for which there is strict liability. On any of these bases the defendant may be liable. On the other hand, the invasion may be intentional but reasonable; or it may be entirely accidental and not fall within any of the categories mentioned above. In these cases there is no liability.' [Citations.] [¶] As the Restatement explains, 'In early tort law the rule of strict liability prevailed. . . . In course of time the law came to take into consideration not only the harm inflicted but also the type of conduct that caused it, in determining liability. This change came later in the law of private nuisance than in other fields. Private nuisance was remediable by an action on the case irrespective of the type of conduct involved. Thus the form of action did not call attention to the change from strict liability to liability based on conduct. But the change has occurred, and an actor is no longer liable for accidental interferences with the use and enjoyment of land but only for such interferences as are intentional and unreasonable or result from negligent, reckless or abnormally dangerous conduct.' [Citations.]" (*Lussier* v. *San Lorenzo Valley Water Dist.* (1988) 206 Cal.App.3d 92, 100-101 [253 Cal.Rptr. 470].) "At first glance it may appear that our analysis blurs the distinction between negligence and nuisance and contradicts the often-stated proposition that one may be liable

for a nuisance even in the absence of negligence. [Citations.] However, upon closer inspection, what emerges clearly is but confirmation of a long recognized fact: under certain circumstances, the worlds of nuisance and negligence overlap and the two become merely alternative legal theories for redressing what is really the invasion of a single primary right: the right to the undisturbed enjoyment of one's property and land. [Citation.]" (*Id.* at pp. 103-104; see also *id.* at pp. 104-106.)

Thus Paterno's claim that nuisance is *necessarily* easier to prove, because it does not require a showing of negligence, is wrong. In one case, the trial court failed to instruct on nuisance, only on negligence, in a case involving the sedimentation of ponds. The plaintiff appealed, claiming he was entitled to a nuisance instruction. After explaining why the case did not present theories of nuisance based upon ultrahazardous activity or intentional conduct, the court held "The third basis for asserting nuisance is negligence. As to this the jury was fully instructed. Nothing would have been added by terming the claimed negligence a 'nuisance.' Damages in 'nuisance' or negligence are similarly measured. On the particular facts shown at this trial, precisely the same evidence which would establish negligence would also establish 'nuisance' based on negligent conduct. Thus plaintiffs had the full benefit of this ground of recovery." (*Dufour* v. *Henry J. Kaiser Co.* (1963) 215 Cal.App.2d 26, 29-30 [29 Cal.Rptr. 871].) If Paterno thought something "would have been added" by the jury's consideration of a nuisance theory, it was up to him to explain why on appeal. He did not.

IV. *Miscellaneous contentions.*

(IV)(A). *Simple negligence.*

The trial court sustained a demurrer to a count alleging simple negligence. Without explaining in what manner this theory was not duplicative of others, Paterno asserts he stated a good count. To the extent he suggests he may pursue a negligence claim without complying with the California Tort Claims Act, he is mistaken. To the extent he asserts he has pleaded public employees were negligent, giving rise to vicarious liability (Gov. Code, § 815.2), he has failed to set forth the pleaded claims and supporting evidence. He states the elements of negligence and avers "Plaintiffs amply alleged these elements, including Defendants' violation of their duties under federal law, the Water Code and Civil Code Section 1714(a), which requires ordinary care in managing one's property. [Citations.]" ▆▆▆ An appellant cannot rely on incorporation of trial court papers, but must tender arguments *in the appellate briefs.* (*Garrick Development Co.* v. *Hayward Unified School Dist.* (1992) 3 Cal.App.4th 320, 334 [4 Cal.Rptr.2d 897].) Further, Paterno has failed to tender a proper prejudice argument. With even less amplification than with his nuisance argument (see pt. III(D), *ante*), he baldly asserts

negligence "required fewer elements of proof, and thus presented a more favorable basis for tort recovery, than the tort claims for dangerous property condition and nuisance." This mode of argument does not satisfy an appellant's duty to demonstrate a miscarriage of justice.

 The question of abuse of discretion in sustaining a demurrer without leave to amend is "open on appeal even though no request to amend such pleading was made." (Code Civ. Proc., § 472c, subd. (a).) However, "As used in this section, 'open on appeal' means that a party aggrieved . . . may claim the order as error in an appeal from the final judgment in the action." (*Id.*, subd. (c).) A party claims error on appeal by tendering explicit arguments in the briefs. "[T]he burden is on the plaintiff to demonstrate that the trial court abused its discretion. [Citations.] Plaintiff must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading. [Citation.] Here appellant has never advanced, either in the trial court or before us, any effective allegation which he could now make if further amendment to the complaint were to be permitted. Although he insinuates multiple wrongs by respondents, he never points out in what manner those insinuations could be combined to state a cause of action. [Citation.]" (*Cooper* v. *Leslie Salt Co.* (1969) 70 Cal.2d 627, 636-637 [75 Cal.Rptr. 766, 451 P.2d 406].) In this case, to the extent Paterno asks for leave to amend, he has failed to set forth proposed amendments. (*Gould* v. *Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1152-1153 [37 Cal.Rptr.2d 718]; cf. *Live Oak Publishing Co.* v. *Cohagan* (1991) 234 Cal.App.3d 1277, 1286 [286 Cal.Rptr. 198].)

(IV)(B). *Remand to a different trial judge.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(IV)(C). *Cost and damage awards.*

The trial court awarded costs on the dangerous condition of property claim, finding the defense was the prevailing party based on the jury verdict disposing of one count in the complaint. But judgments are parceled out at the ration of one per lawsuit. (See Code Civ. Proc., § 577.) The prevailing party is not known until the *judgment.* The Attorney General does not defend the award, and the District's reliance on the "abuse of discretion" standard is unavailing, as there is no discretion to depart from legal standards. (*Bailey* v. *Taaffe, supra*, 29 Cal. at p. 424.) Costs and litigation expenses awarded on the inverse condemnation count (Code Civ. Proc., § 1036) fall with the judgment. Damage issues and disputes over interest rates tendered in the briefs are premature.

---

*See footnote, *ante*, page 68.

(IV)(D). *Substantial participation.*

Defendants boldly claim no evidence supports the finding that either, respectively, is responsible for the Linda levee. The District contends it simply follows orders given by the State and federal governments relating to day-to-day maintenance, that it did not develop any plans of maintenance. It states that it never "accepted" the newly configured Linda levee, although it admittedly maintained it. The State asserts it did not maintain the levee, although it admittedly owns the levee and owes the federal government the duty to ensure its maintenance—reflected in a 1953 memorandum of understanding between California and the United States Army Corps of Engineers—that it is not vicariously liable, and that the trial court's finding of collateral estoppel as to "substantial participation"—premised on litigation arising out of the 1955 floods—is erroneous. These competing claims call to mind a certain Thomas Nast cartoon, regarding the "Tweed Ring." ("Who Stole the People's Money?—'Twas Him.") (But see Wat. Code, §§ 8370, 12878; *Akins, supra,* 61 Cal.App.4th at pp. 11, 48-49, fn. 41; herein pt. III(B), (C), *ante.*) In light of our disposition any discussion of this point on our part would be premature adjudication. If and only if the trial court finds any particular "plan" was unreasonable after applying the *Locklin* factors, and finds such plan was a cause of the flood, will it be necessary to determine the proportionate liability, if any, of each defendant. (See *Akins, supra,* 61 Cal.App.4th at pp. 47-48.)

DISPOSITION

The judgment is reversed with directions to the trial court to forward this opinion to the Judicial Council for assignment of a new trial judge to oversee this coordinated proceeding. The new judge is directed to conduct further proceedings consistent with this opinion. Defendants shall recover costs on appeal. This award of costs is without prejudice to a future award of costs to Paterno, should he ultimately prevail in this case, on issues in which Paterno prevailed in this appeal. (See Code Civ. Proc., § 1036.)

Sims, Acting P. J., and Callahan, J., concurred.

A petition for a rehearing was denied September 10, 1999, and the opinion was modified to read as printed above. The petition of plaintiffs and appellants for review by the Supreme Court was denied November 23, 1999. Mosk, J., was of the opinion that the petition should be granted.