Filed 9/23/25  P. v. Hernandez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D083513 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD289466) |
| EDUARDO FERNANDEZ HERNANDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth K. So and Polly H. Shamoon, Judges.  Request for judicial notice denied.  Judgment affirmed.

Bulldog Law, Mario Tafur and Joshua J. Schroeder, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

Eduardo Fernandez Hernandez and A.S. (Minor) lived in the same apartment complex for several years, when Minor was about nine to 14 years old, and Hernandez was in his thirties. During this time, Hernandez sexually abused Minor on a regular basis in the complex's parking lot and communal laundry room. A jury convicted him of several sex offenses and the trial court sentenced him to 10 years in state prison. Hernandez appeals, raising more than a dozen claims. His contentions, however, were not preserved in the trial court, are not developed in his appellate briefing, or plainly lack merit. There being no basis to find reversible error, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The Minor, her siblings, and her mother moved into the apartment complex when she was a few months shy of nine years old. Hernandez lived in the same complex with his wife and their children. He was almost 30 years old at the time. Minor and her family lived in a unit below street level, near the communal laundry room. Hernandez and his family lived above them, adjacent to the parking lot. Minor, her siblings, and Hernandez's children often played together in the parking lot.

Soon after Minor moved into the complex, she noticed Hernandez winking at her, blowing her kisses, and "catcall[ing]" her, which Minor described as making a clicking sound with his teeth. At the time, Minor did not understand these gestures and thought Hernandez was "a little weird." She also noticed that Hernandez paid "special attention" to her. He would talk to her often—more than any other adult neighbor—asking her about her day or her family.

Things began "escalating" from there. Around the time she turned nine years old, he began rubbing his stomach and "crotch area" on her back when

she was near her mother's car in the parking lot. She thought this was odd and felt scared. Over time, he began touching her more "aggressively." He would grab her waist, touch her breast under her shirt, grab her butt, touch her crotch over her clothes, and attempt to put his hand inside her jeans. The grabbing was painful to her. He kissed her neck and ears, moaned in her ear, and said "inappropriate things" to her, like "how much he liked it" and found her "attractive."

The abuse happened almost daily the entire time Minor lived in the apartments—from when she was about nine years old until 14 years old. It typically happened at night in the parking lot—when she was locking her mother's car—or in the laundry room when no one else was around. Minor would tell him to let go, but she could not "fight him off" or "push him away" given their size difference. Most of the time, he was laughing, smiling, "having fun," and telling her "how much he liked it," which frightened her.

One night when Minor was 10 or 11 years old, she was in the laundry room waiting for the dryer to finish. Hernandez came up behind her, "grabbed [her] butt really hard," and then picked her up. He grabbed the back of her neck and "forcibly kissed" her. He put his tongue inside her mouth and bit her lip. She struggled to pull away because he was grabbing her neck so hard, but she managed to bite him back, which made him laugh and let go. Minor ran home, brushed her teeth, and cried.

Another night years later, when Minor was 14 years old, she was grabbing something out of her mother's car when Hernandez came up behind her and essentially trapped her between the car door and his body. He grabbed her wrist "really hard," pulled his basketball shorts open, and "tried to make [her] grab his private area." She felt his pubic hair but

3

"fought him as hard as [she] could" to pull her hand away. He finally let go of her wrist when she threatened to tell somebody.

Minor was not sure whether anyone else ever witnessed the abuse. One particular night, however, Minor believed Hernandez's wife saw him grab her butt "really hard" in the parking lot from behind the screen door of their apartment. To Minor, it seemed like she "didn't care" and "kind of just let it happen." Having an adult woman witness the abuse and "turn the other way" made Minor feel like "it wasn't worth telling" anyone about it.

At some point, Minor's friends who lived nearby—Alondra N. and Kevin L.—began to notice "the way" Hernandez looked at her or acted with her. Initially, Minor was not ready to tell anyone what was going on. But around the time that her family was moving away from the apartments—in 2017, when she was 14 years old—she confided in Alondra. Minor felt more comfortable telling Alondra once she knew her family was moving because she would not have to "re-live the situation" after she told her. She confided in Kevin shortly after that.

In August 2020, Minor's mother told her that she had been abused when she was a child and that she hoped Minor would tell her if anything like that ever happened to her. Minor began crying and told her mother that Hernandez abused her. Minor's mother took her to her pediatrician the next day. The doctor advised them to report the abuse to the police and/or made the report himself. Two police officers came to the house and interviewed Minor later that same night.

Two weeks later, the detective assigned to the case, Detective Tyler Young, arranged for Minor to make a pretext phone call to Hernandez. As discussed in greater detail below, Hernandez made incriminating remarks during the pretext call, such as offering to go to Minor's house to do "the same

4

thing" he did "[i]n the parking lot." After the pretext call ended, Hernandez called Minor repeatedly attempting to meet up with her in person. She told him she was busy, stopped answering the phone, and obtained a temporary restraining order against him. Hernandez was arrested soon after that.

The prosecution charged Hernandez with one count of committing a forcible lewd act upon a child under the age of 14 (touching her lips with his mouth in the laundry room) (Pen. Code, § 288, subd. (b)(1)), three counts of committing a lewd act upon a child under the age of 14 (touching her breast, vagina, and butt with his hand) (*id*., subd. (a)), and one count of committing a lewd act upon a child 14 or 15 years of age (touching her wrist with his hand attempting to make her touch his penis) (*id*., subd. (c)(1)).

At trial, several witnesses testified that they never saw the abuse, including Minor's mother; her childhood friend Kevin L.[1]; Hernandez's wife; and his son, who was a teenager at the time of trial. Kevin testified that he did not believe Minor was telling the truth because the neighborhood children were always playing together in the parking lot, so they would have seen something. He also remembered Minor approaching Hernandez anytime he came out to check on his children, and following him down to the laundry room.

A jury ultimately found Hernandez guilty as charged. The trial court sentenced him to 10 years in prison, consisting of eight years (the midterm) for the forcible lewd act count, two years (one-third the midterm) for one nonforcible lewd act count, and concurrent terms for the remaining counts.

---

[1]    At the time of trial, Minor and Kevin were no longer friends, but he remained close friends with Hernandez's son.

## DISCUSSION

### A.  *Evidentiary Errors*

In a section of his brief titled "Matters Preserved For Appeal,"
Hernandez identifies several instances where defense counsel objected to
the admission of certain evidence, in an apparent attempt to argue the trial
court abused its discretion in admitting such evidence over defense objection.
We address what we can make of the argument as to each item of evidence
in turn, but ultimately discern no reversible error.

#### 1.  *Investigator Medina's Testimony Regarding the Pretext Call*

Hernandez first contends the trial court "erred by allowing speculation
or impermissible opinion including the lay opinion of [District Attorney]
Investigator Medina over the defense's motion in limine and subsequent
objections."  More specifically, Hernandez argues the court "inappropriately
allowed Medina to reinterpret the tone of [Hernandez] for the jury (who have
ears) as 'flirtatious' by virtue of his interpretation of Spanish."  By allowing
Medina's opinions into evidence, Hernandez claims the court violated
Evidence Code sections 352, 720, and 801, as well as his constitutional rights.

##### a.  *Additional Background*

Before trial, the prosecution moved to admit the audio recording of the
pretext call between Hernandez and Minor, along with a Spanish-to-English
transcript and the testimony of Investigator Carlos Medina.  The prosecution
explained that Medina—who grew up speaking Spanish, minored in Spanish
in college, was formerly a certified Spanish speaker with the San Diego Police
Department (SDPD), and currently served as a certified Spanish speaker for
the District Attorney's office—reviewed the recording and confirmed the
accuracy of the Spanish-to-English transcript.  At trial, Medina would lay the
foundation for the recording and transcript, and "provide relevant and helpful

6

information to the jury regarding common Spanish slang, terms of affection or endearment, and provide additional context to the conversation between [Minor] and [Hernandez]."

The defense moved "to preclude speculation or impermissible opinion, including the lay opinion of District Attorney Investigator Medina." The defense expected Medina to opine that Hernandez spoke to Minor "in a 'very friendly manner unlike an adult speaking to a child,' " "used a 'flirtatious' tone," " 'sounded disappointed' when [she] left without saying goodbye to him," and " 'groomed' " her. The defense argued this was inadmissible lay opinion testimony because Medina was not present during the pretext call. And it was inadmissible expert opinion because he was not an expert "in communications, tone of voice, sexual grooming," or any other relevant topic. Moreover, Medina's opinions were not sufficiently beyond the common experience of the jury, and the evidence was more prejudicial than probative under Evidence Code section 352.

At the hearing on motions in limine, the prosecutor elaborated that Medina would provide an admissible lay opinion regarding Hernandez's demeanor because the entire pretext phone call was in Spanish. For those jurors who do not speak the language, it would be helpful for Medina, a Spanish speaker, to give meaning to the conversation beyond the literal translation. For instance, he could explain that Hernandez was speaking affectionately when using terms like "muchacha" and "mija." The trial court initially took the matter under submission.

At trial, Medina explained he had been a district attorney investigator for eight years, and before that he was an officer and sergeant with SDPD for 30 years. He had spoken Spanish his entire life, minored in Spanish in college, and "worked predominantly in the Latino areas" and near the border

7

during his time with SDPD.  On cross-examination, Medina confirmed that he was not a court-certified interpreter or "a Mexican linguistics expert."  He admitted he did not know where Hernandez or Minor may have been from.  Medina also acknowledged he was not personally present for the pretext call.

When the prosecutor asked Medina about his "overall impression" of "Hernandez's demeanor when speaking to Minor on this call," defense counsel objected on foundation and speculation grounds, noting Medina was not part of the call.  In a sidebar conference, defense counsel clarified that she did not take issue with Medina explaining Spanish terms, but objected to him opining that Hernandez had an "affectionate" or "flirtatious" tone during the call.  She also argued that to the extent the prosecutor posited this was lay opinion testimony, the jury would not view Medina as a lay witness given his professional background.  The trial court overruled the objection.

Back in open court, Medina agreed that Hernandez's overall tone during the call was flirtatious and affectionate based on his choice of words, his manner of speaking, and the context of the entire conversation.  He "felt it was very inappropriate for a grown man" to speak to a child that way.  The prosecutor then had Medina review certain portions of the pretext call recording and transcript, confirm the Spanish-to-English translation was accurate, and then explain any latent nuances in the conversation.  For instance, in one portion of the call, Hernandez and Minor were discussing what he would do "in the parking lot."  As translated to English, they engaged in the following back-and-forth:

> "[Minor:]  You loved it, right?
>
> "[Hernandez:]  You know it, right?  Me, what?
>
> "[Minor:]  You loved it, right?
>
> "[Hernandez:]  We, what?

"[Minor:]  "You loved it, right?

"[Hernandez:]  We, what?

"[Minor:]  You loved it, right?

"[Hernandez:]  No.

"[Minor:]  Oh, yes.

"[Hernandez:]  You."

Medina explained to the jury that the way Hernandez was speaking—and his use of repetition in particular—was "very flirtatious" and was "reaffirming" that "we liked it."

Other times during the call—for instance, when Minor asked whether Hernandez still loved her and whether he wanted to "do something right now"—Hernandez responded, "Oh, your mother's daughter."  Medina explained this was akin to saying, " 'Son of a gun.' "

When Hernandez confirmed Minor was "the only one," Medina opined that was "very sexual content."  In asking whether Minor's boyfriend was "canijo," Hernandez was essentially inquiring whether he was a "softy," which Medina took to mean Hernandez was "looking for an 'in' with" Minor and "[s]eeing if he can get close to her."  When Hernandez asked if Minor liked "older ones," he meant older men, which had a "romantic" connotation.  And when Minor said Hernandez was "the first man," this, too, referred to a "romantic" relationship.

After Medina completed his testimony, the trial court clarified that the opinions he offered "crosse[d] the line between lay opinion and expert opinion."  The court nevertheless found that Medina was qualified to testify as an expert "because he's been a Spanish speaker, he studied Spanish, and all of the evidence that he testified to concerning his qualifications."

9

The court also indicated this was a proper subject for expert testimony because the pretext call was in Spanish which "may not be the understood language of the average citizen." The defense registered another objection for the same reasons previously articulated.

b.     *Hernandez Fails to Demonstrate Prejudice*

Even assuming the trial court erred in allowing Medina to opine that Hernandez had a "flirtatious" and "affectionate" tone in speaking with Minor, Hernandez fails to demonstrate prejudice.[2]

"The erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 247; see also *People v. Watson* (1956) 46 Cal.2d 818, 836 ["a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].) "[W]e cannot presume prejudice and will not reverse the judgment in the absence of an affirmative showing there was a miscarriage of justice." (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963.) "[T]he appellant bears the duty of spelling out in [their] brief exactly how the error caused a miscarriage of justice." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 (*Paterno*).) Here, Hernandez does not articulate how he might have achieved a better result had the trial court precluded the testimony about his tone.

---

[2]     To the extent Hernandez also challenges Medina's translation of certain Spanish words and phrases, we deem the argument waived as defense counsel limited her objection to Medina giving an opinion as to Hernandez's tone.

"An appellate court is not required to examine undeveloped claims, nor to make arguments for parties." (*Paterno*, *supra*, 74 Cal.App.4th 68, 106.) We note, however, that any prejudice is not apparent to us. The pretext phone call is incriminating without resorting to any opinion that Hernandez's tone was flirtatious or affectionate. The transcript itself reveals that he offered to go to Minor's house to do "the same thing" he did "[i]n the parking lot." He said he loved her and remembered "[m]any things" that he could not discuss over the phone. When Minor asked if Hernandez remembered grabbing her "there" and grabbing her butt, he responded, "Oh, well," and "Um," and asked whether she was alone. He said he would have to tell her "personally" whether he "like[d] it" and "miss[ed] it." He confirmed she was "the only one" and thanked her for never telling his wife or children. There is no reasonable likelihood the jury would have found this conversation to be innocent or ambiguous but for Medina's testimony regarding tone.

Moreover, as Hernandez tartly points out, the jurors "have ears." To the extent the jurors found his tone something other than flirtatious and affectionate, they were free to disregard Medina's testimony on that point. Indeed, the trial court specifically instructed the jurors that they were "not required to accept" lay or expert opinions "as true or correct" but instead could "disregard" any opinion they found "unbelievable, unreasonable, or unsupported by the evidence." (CALCRIM Nos. 332 & 333.)

2.    *The Pretext Call*

Hernandez relatedly claims the court erred in admitting the pretext call itself because it was irrelevant and contained hearsay.[3]

---

3    In this section of his brief, Hernandez also appears to argue the trial court erred in failing to exclude evidence of his postarrest interview. The prosecution did not present this evidence at trial.

11

Before trial, the defense moved "to exclude statements of Mr. Hernandez, including a pre-textual phone conversation" on hearsay, relevance, and Evidence Code section 352 grounds. The defense elaborated that the evidence was not admissible as a party admission (Evid. Code, § 1220) or statement against one's interest (*id.*, § 1230) and was irrelevant because Hernandez did not admit any inappropriate relationship or inappropriate touching during the call. The prosecutor posited that the pretext call was admissible because it included adoptive admissions (*id.*, § 1221). The trial court admitted the call, agreeing it contained admissions about "certain things."

Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.)

"Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.) "Under this provision, '[i]f a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.' [Citations.] 'For the adoptive admission exception to apply, . . . a direct accusation in so many words is not essential.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1189 (*Riel*).) "Rather, it is enough that the

12

evidence showed that the defendant participated in a private conversation in which the crime was discussed and the circumstances offered him the opportunity to deny responsibility or otherwise dissociate himself from the crime, but that he did not do so." (*People v. Davis* (2005) 36 Cal.4th 510, 539.)

" 'To warrant admissibility, it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide.' " (*Riel, supra*, 22 Cal.4th at pp. 1189–1190.) We review the trial court's decision to admit evidence under this exception for abuse of discretion. (*People v. Charles* (2015) 61 Cal.4th 308, 322.)

Here, we agree with the trial court that the circumstances of the pretext call "warranted presenting the evidence to the jury and letting the jury decide what weight to give it." (*Riel, supra*, 22 Cal.4th at p. 1189.) Although Minor did not directly accuse Hernandez of sexually abusing her, she discussed various aspects of the abuse in an ostensibly one-on-one conversation with Hernandez, and he did not deny or distance himself from her suggestions. To the contrary, Hernandez seemed to understand exactly what she was referring to. Consider the following colloquy, for example:

> "[Minor:] Yes, I just wanted to talk about what would happen there in the parking lot. You already know, don't you?
>
> "[Hernandez:] No, do you want – what do you want to talk about or what? What is wrong?
>
> "[Minor:] Nothing, I was just remembering, and I was curious if you remembered too.
>
> "[Hernandez:] I've always remembered."

13

If nothing significant happened in the parking lot, one would expect Hernandez to deny recalling anything, or seek clarification as to what Minor was referring to. Instead, he confirmed that he remembered. Later in the pretext call, Minor asked whether Hernandez remembered grabbing her "there" and grabbing her butt, he responded, "Oh, well," and "Um," and asked if she was alone. Again, if that never happened one would expect him to deny touching her, or at least express confusion as to what she was talking about. To be sure, at some points in the conversation, Hernandez seemed to disagree with Minor, or at least gave more ambiguous responses. For instance, when she told him he was her "first," he initially denied "do[ing] anything to [her]," but when she insisted, he asked, "Wasn't it Kevin?" To which she answered, "No." In any event, "even 'contradictory statements' are admissible under the adoptive admission rule." (*People v. Mendez* (2019) 7 Cal.5th 680, 702.) To the extent the jury could reasonably infer from the pretext call that Hernandez admitted to abusing Minor, the evidence was clearly relevant to his guilt at trial.

3.      *Expert Testimony on Delayed Disclosure of Child Sexual Abuse*

Hernandez next argues the trial court erred by allowing an expert on child sexual abuse to testify "that certain victim reports of abuse are typical when they are categorically not typical, as most people are not abused[,] and even among those who are abused[,] most do not report their abuse." He contends "the only reason to offer this testimony is to suggest that [Minor] was abused" in violation of *People v. Bledsoe* (1984) 36 Cal.3d 236 (*Bledsoe*) and *People v. Bowker* (1988) 203 Cal.App.3d 385 (*Bowker*).

a.      *Additional Background*

In light of the fact that Minor waited until she moved away from the apartments to tell Alondra about the abuse, and then waited several more

14

years before telling her mother, the prosecution sought to admit the expert testimony of Christina Shultz—the program manager in one of two Child Advocacy Centers in San Diego County—regarding the patterns of disclosure of child sexual abuse. The prosecution clarified that Shultz—who was unfamiliar with the details of this case—would testify about delayed disclosure generally; she would not testify as to whether Minor was in fact abused. The testimony was intended to dispel any misconceptions the jury may have about child sexual abuse reporting—for instance, that a child who was abused would tell someone right away.

The defense objected on grounds that expert testimony regarding child sexual abuse accommodation syndrome (CSAAS)[4] was unreliable to prove that sexual abuse occurred under the *Kelly/Frye*[5] test. It was further argued that the probative value of the expert testimony was outweighed by the probability that it would create undue prejudice, confuse the issues, and mislead the jury under Evidence Code section 352. The defense asked the court to exclude Shultz's testimony, or limit it to dispelling misconceptions actually implicated here in terms of victims generally as opposed to Minor specifically.

The trial court allowed the testimony over defense objection. At trial, Shultz confirmed that she knew "[v]ery little information" about this case. She did not meet Minor or review any police reports, medical records, or interviews involving her. Shultz denied knowing whether Minor was truthful or not.

---

[4] Delayed disclosure is considered to be part of CSAAS. (See, e.g., *People v. Sedano* (2023) 88 Cal.App.5th 474, 478 (*Sedano*).)

[5] *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (1923) 293 F. 1013.

Shultz explained that "child sexual abuse disclosure" is "the process in which a child – an alleged victim of sexual abuse goes about providing information about what has happened." Research indicates that about two-thirds of children do not disclose sexual abuse right away. "[O]ftentimes, there's a delay of months, if not years." Some reasons for the delay include the child's lack of understanding that what happened was wrong, a close relationship with the perpetrator, and fear surrounding what will happen after the disclosure. A child might disclose when they feel they cannot "take it anymore," out of concern that the perpetrator is targeting another child, or once the perpetrator is out of their life. "[I]n many cases," when a child discloses, they do so incrementally, meaning "they may tell a little bit, and wait to see what the reaction is of the person that they told" and then, depending on the reaction, provide more information later on. Incremental disclosure may also occur because the child is not comfortable discussing difficult details at a certain time or with a particular person, or because they simply remember additional details over time.

b.    *Shultz Did Not Exceed the Proper Scope of CSAAS Testimony*

In *Bledsoe, supra,* 36 Cal.3d 236, the Supreme Court held that expert testimony regarding rape trauma syndrome is inadmissible to prove the complaining witness was in fact raped. (*Id.* at p. 251.) Such testimony is admissible, however, "to rehabilitate the complaining witness when the defendant impeaches her credibility by suggesting that her conduct after the incident—e.g., a delay in reporting—is inconsistent with her testimony that she was raped." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.) In that context, the court explained, "expert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely

16

held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*Bledsoe*, at pp. 247–248.)

A few years later, this court extended these principles to the CSAAS context in *Bowker*, *supra*, 203 Cal.App.3d 385. Thus, CSAAS evidence is likewise inadmissible to show a child has been abused, but admissible "for the limited purpose of disabusing the jury of misconceptions as to how child victims react to abuse." (*Id*. at p. 392.) To ensure the jury learns "relevant, accurate information" regarding the research on CSAAS "without the danger that such information will be misapplied as a predictive index by the jury," certain limitations were prescribed in *Bowker*. (*Id*. at p. 393.) Minimally, the expert testimony "must be targeted to a specific 'myth' or 'misconception' suggested by the evidence." (*Id*. at pp. 393–394.) "For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with" having been abused. (*Id*. at p. 394.) In addition, "the jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Ibid*.) "The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*Ibid*.)

"We review for abuse of discretion decisions regarding the admissibility of expert testimony" (*Sedano, supra*, 88 Cal.App.5th at p. 479), and we discern no such abuse here. Shultz's testimony was expressly intended to dispel any misconceptions the jurors might have had regarding delayed disclosure of child sexual abuse. This was proper given the evidence that Minor waited several years to tell her friends and then her mother about the abuse. (See *Bowker, supra*, 203 Cal.App.3d at pp. 393–394.)

17

Shultz's testimony was limited to explaining that, according to the research, about two-thirds of children do not disclose sexual abuse right away, and in many cases, they disclose incrementally. Shultz went on to provide, in general terms, some reasons for these behaviors. This was within the scope of permissible CSAAS testimony. (Cf. *Sedano, supra*, 88 Cal.App.5th at p. 483 [expert testimony regarding how often children delay disclosing sexual abuse was admissible "to ensure that the jury *did not* conclude that Doe's allegations must be *false* based on adverse assumptions from her multiyear delay in disclosure"]; see also *Bowker*, at p. 393 [expert testimony "that child abuse victims often exhibit a certain characteristic or that a particular behavior is not inconsistent with a child having been molested" may be admissible].) Moreover, given Shultz's testimony that she was unfamiliar with this case, had never met Minor, and did not know whether she was truthful, there was no real risk that the jury concluded that because Minor waited to disclose the abuse, she must be telling the truth.

Any doubt as to whether the jury drew this impermissible inference from Shultz's testimony is extinguished when the trial court's instruction to the jury regarding this evidence is considered. The court instructed the jury with CALCRIM No. 1193, which told the jury that Shultz's testimony was "not evidence that the defendant committed any of the crimes charged" and they could "consider this evidence only in deciding whether or not [Minor's] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

In sum, there was no error in admitting Shultz's testimony, which was appropriately directed to dispelling the potential misconception that children who have been sexually abused disclose promptly and in detail what happened.

18

4.    *Evidence Excluded at the Defense's Request*

Curiously, Hernandez claims the trial court also erred by admitting evidence that (a) Minor and her family received threatening phone calls regarding the case and (b) Hernandez's wife had an emotional reaction to the pretext phone call. There are no arguable issues here, as the court granted defense counsel's motion to exclude this evidence before trial. (See *Marich v. MGM/UA Telecommunications, Inc.* (2003) 113 Cal.App.4th 415, 431 [appellants cannot challenge on appeal rulings that the trial court made in their favor].)

5.    *Minor's Disclosure to Her Friend Alondra*

The final alleged evidentiary error that Hernandez points to is the admission of evidence that Minor told her childhood friend Alondra about the abuse shortly before she moved away from the apartment complex. His argument here is difficult to discern, but he seems to claim the court wrongly allowed Minor to relate hearsay statements made by Alondra.

Before trial, the prosecution moved to admit the challenged evidence under the " 'fresh complaint' " doctrine. The defense objected, insisting the evidence was irrelevant and inappropriate "as a prior consistent or prior inconsistent statement." The defense also suggested the disclosure was too late to be considered a fresh complaint. The trial court overruled the defense's objection and admitted the evidence.

At trial, when Minor shared this part of her testimony, she began by explaining that Alondra told her she noticed the way Hernandez looked at her and acted with her, and that she could feel safe telling her what was going on. Defense counsel objected on hearsay grounds. The prosecutor responded that the testimony was not offered for the truth of the matter asserted, and the court overruled the objection. Minor went on to describe

19

the circumstances of the disclosure, including when and where the conversation took place, why she finally felt comfortable telling Alondra, and how she felt afterward. She did not go into detail about the conversation itself. There were no further objections from defense counsel on this topic.

Hernandez makes the sweeping argument that "[t]he amount of testifying for others that the court allowed the victim and other witnesses for the [P]eople to do was beyond the limits set by the federal and state constitutions and therefore the trial verdicts should be reversed." But he fails to develop any argument that specific statements attributable to Alondra were hearsay not subject to any exception. From our review of the relevant portion of the record, the only statements of Alondra related by Minor were her initial comments acknowledging the inappropriate behavior and encouraging Minor to tell her the truth. The trial court overruled defense counsel's hearsay objection on this point, and Hernandez fails to explain why that ruling was erroneous. "[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609 (*Jameson*).) Hernandez has not met his burden here.

To the extent Hernandez maintains that Minor's disclosure was not "fresh enough" for the "fresh complaint" doctrine to apply, we note that under current law, "a child victim's delay in disclosing sexual assault generally goes to the weight of the disclosure, not its admissibility." (*People v. Flores* (2024) 101 Cal.App.5th 438, 454–455; see also *People v. Brown* (1994) 8 Cal.4th 746, 750.)

20

## B.    Griffin/Doyle *Error*

Circling back to the pretext phone call, Hernandez additionally argues that the prosecutor committed *Griffin/Doyle* error by presenting evidence of the call to the jury at trial.  The contention lacks merit.

In *Doyle v. Ohio* (1976) 426 U.S. 610, the high court held it is a due process violation for a prosecutor to impeach a defendant with their postarrest, post-*Miranda*[6] silence.  (*Doyle*, pp. 617–619.)  That principle is inapplicable here, at least because the pretext phone call occurred before Hernandez was ever arrested or given *Miranda* advisements.  (See *People v. Bowman* (2011) 202 Cal.App.4th 353, 363 [*Doyle* "does not prohibit the prosecution's use of a defendant's prearrest silence"].)

The court in *Griffin v. California* (1965) 380 U.S. 609 held that a defendant's right against self-incrimination is violated when a prosecutor comments on their decision not to testify.  (*Id.* at p. 615.)  Hernandez claims "the prosecutor used the pre-textual phone call to imply or suggest that evidence is uncontradicted and contradiction could only be provided by defendant, which is a *Griffin* error."  It is true "that a prosecutor may commit *Griffin* error if he or she argues to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339.)  But Hernandez fails to develop an argument or cite any authorities to support the proposition that a prosecutor can commit *Griffin* error by simply introducing evidence at trial, as opposed to making a comment before the jury.  We thus treat the claim as waived.  (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*)

---

6    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

21

[" '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration' "].)

## C.    *Defense Objections to the Prosecutor's Questions*

Hernandez next asserts the trial court "erred by overruling several defense objections to the prosecution's questions that improperly impeached defense witnesses, elicited hearsay, speculation, testimony that lacked foundation, and irrelevant responses such that their probative value was outweighed by the risk of prejudice." By our count, he lists more than 40 pages of the reporter's transcript containing "one or more objections" by defense counsel. He does not explain the context or grounds for any of these objections, the trial court's ruling, why that ruling was incorrect (with citation to legal authorities), or how the result of the proceeding would have been different had the court sustained the objection. He simply claims that, "[c]ollectively," the court's rulings "amounted to structural error that undermined the legitimacy of the trial and requires" a complete reversal. Here, too, we must reject this contention as undeveloped for appeal. (See *Jameson*, *supra*, 5 Cal.5th at pp. 608–609; *Stanley*, *supra*, 10 Cal.4th at p. 793; *Paterno*, *supra*, 74 Cal.App.4th at p. 106.)

## D.    *Instructional Errors*

Hernandez raises three instructional error claims: the court erred by instructing the jury on duress and adoptive admissions because the evidence did not support the instructions, and it misspoke when it orally instructed the jury on the offense of committing a lewd act with a child. We consider each of these claims in turn, and find no prejudicial error.

1.    *Duress*

Hernandez principally asserts the trial court erred by instructing on duress in response to a written jury question sent out during deliberations, because the evidence did not support a theory of duress.

The trial court instructed the jury on the offense of committing a forcible lewd act upon a child under the age of 14 (Pen. Code, § 288, subd. (b)(1)) using CALCRIM No. 1111. That instruction states, in relevant part, that to find Hernandez guilty of the offense, the prosecution needed to prove that he (1) "willfully touched any part of a child's body either on the bare skin or through the clothing"; (2) "[i]n committing the act, [he] used force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the child or someone else"; (3) he committed the act with a lewd intent; and (4) the child was under the age of 14 at the time. The instruction further explained that "[t]he *force* used must be substantially different from or substantially greater than the force needed to accomplish the act itself."

During deliberations, the jury sent a note to the judge seeking additional clarification regarding force. In part, the jury asked whether "fear or duress" constituted " 'emotional force.' " The court and counsel for both parties discussed the jury note on the record, outside the jury's presence.

The prosecutor stated that CALCRIM No. 1111 includes an optional definition of duress, but he did not ask the court to give that language because he was relying on a theory of force, not duress. Defense counsel and the court agreed the evidence did not support a theory of duress. The prosecutor nevertheless suggested the court provide the definition of duress set forth in the pattern instruction, insofar as the jury was "exploring that as a potential theory" and requesting the definition. The court ultimately agreed and instructed the jury: Duress means the use of a direct or implied

23

threat of force, violence, danger, hardship, or retribution sufficient to cause a reasonable person to do or submit to something that he or she would not otherwise do or submit to. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the child and her relationship to the defendant." (CALCRIM No. 1111.)

Even accepting the premise that the evidence did not support any theory of duress, such that the trial court erred in instructing the jury on that theory, Hernandez has not shown reversible error. When a jury is presented with two theories of guilt, one of which is unsupported by the evidence presented in the case, we generally affirm the judgment so long as a valid theory for the verdict remains. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) This is because jurors are well equipped to analyze the evidence and determine that a factually inadequate theory does not apply. (*Id.* at p. 1131.) Reversal is warranted only if "a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*Id.* at p. 1130.) Here, Hernandez makes no attempt to argue the jury relied on the duress theory.

2.    *Adoptive Admissions*

Next, Hernandez claims the court erred in instructing the jury on adoptive admissions (CALCRIM No. 357) because the pretext phone call did not contain any such admissions. Hernandez forfeited this argument by failing to object to the instruction in the trial court. (See *People v. Geier* (2007) 41 Cal.4th 555, 590.) Even assuming Hernandez had preserved this issue for appeal, we would find no error. "It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record, which, if believed by the jury, will

24

support the suggested inference." (*People v. Clark* (2016) 63 Cal.4th 522, 605, internal quotation marks omitted.) As explained in section A.2., *ante*, the jury could have reasonably determined that the pretext call contained adoptive admissions given that Minor discussed the circumstances of the abuse and Hernandez did not deny familiarity or responsibility. Moreover, in the event the jury agreed with Hernandez that Minor did not make any accusations or statements tending to connect him with the abuse during the call, it was instructed not to "consider either the statement or the defendant's response for any purpose." (CALCRIM No. 357.) We presume the jury followed this instruction. (*People v. Davis* (2005) 36 Cal.4th 510, 537.)

3.    *Lewd Act with a Child*

Hernandez lastly points out that the trial court misspoke when it orally instructed the jury regarding the willfulness element of the lewd act with a child offense, which could have confused the jury.

The trial court instructed the jury on committing a nonforcible lewd act upon a child under 14 years of age (Pen. Code, § 288, subd. (a)) using CALCRIM No. 1110. That instruction states, in relevant part, that to prove Hernandez was guilty of this crime, the prosecution needed to prove that he "willfully touched any part of a child's body either on the bare skin or through the clothing." The instruction goes on to clarify the meaning of "willfully" as follows: "Someone commits an act *willfully* when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, *or gain any advantage*." (CALCRIM No. 1110, italics added.) When the court was reading this instruction to the jury, however, it may have misspoke in reading the definition of "willfully." Instead of "or gain any advantage," the transcript reads, "or being in an advantage." We have no

way of knowing whether the error was by the judge in reading the instruction or by the reporter in transcribing what the judge said.

In any case, " '[i]t is generally presumed that the jury was guided by the written instructions.' . . . The written version of jury instructions governs any conflict with oral instructions. . . . Consequently, as long as the court provides accurate written instructions to the jury to use during deliberations, no prejudicial error occurs from deviations in the oral instructions." (*People v. Rodriguez* (2000) 77 Cal.App.4th 1101, 1113, citations omitted.) There is no prejudicial error here because the jurors received written copies of the instruction to take with them into the deliberation room. Hernandez does not argue that the written instructions contained incorrect language.

## E.    *Trial Court Bias*

Hernandez next contends the trial court exhibited implicit bias in favor of sexual abuse victims and "against the Spanish language and/or Mexican culture" such that he was denied his due process rights to an impartial judge and a fair trial. As evidence of such bias, Hernandez points to the fact that the court allowed Investigator Medina to translate Spanish words and phrases used during the pretext call and to opine that his tone was flirtatious or affectionate.[7] Hernandez also cites the fact that the court instructed the jury on duress.

Hernandez forfeited this claim by failing to object or move to disqualify the judge based on bias in the trial court below. (See *People v. Johnson*

---

[7]    At one point in this section of his brief, Hernandez suggests that "not one but two officers" were "put on the stand to re-interpret Spanish phrases made" during the pretext call. Regarding the supposed second officer, he cites one page of Detective Young's testimony where he discusses a prior conversation he had with Hernandez's wife. There is no mention of the pretext call or any translation of Spanish phrases.

(2018) 6 Cal.5th 541, 592.) "A defendant may not go to trial before a judge, betting on a favorable result and failing to raise objections of bias, and then argue on appeal that the judge was biased." (*Ibid.*) We therefore do not reach the merits of the claim. We note, however, that an adverse evidentiary ruling does not in itself establish judicial bias. (See *People v. Pearson* (2013) 56 Cal.4th 393, 446–447.) And it is not at all clear to us how providing the jury with the standard definition of duress in response to its question during deliberations reflected bias against Mexican culture.

## F.    *Ineffective Assistance of Counsel*

Hernandez additionally claims his trial counsel rendered ineffective assistance. He lists, by our count, 13 instances where counsel failed to object to various pieces of witness testimony on hearsay, relevance, or foundation grounds. To this list, he adds nine instances where counsel should have objected to the form of the prosecutor's questions of the witnesses, his use of the term "catcall," and certain remarks the prosecutor made during closing argument. In two single-sentence assertions, he also faults trial counsel for failing to (1) "develop ulterior bases for why the victim might have been faking her trauma and fabricating events to get medication" and (2) move for a mistrial because the evidence was "confusing" and "contradictory."

"When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's

27

reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. . . . On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Hernandez fails to carry his burden of establishing either prong of an ineffective assistance claim. Because deciding whether to object to evidence or argument is highly tactical, and tactical decisions are entitled to substantial deference, the failure to object rarely establishes counsel's incompetence. (*People v. Centeno* (2014) 60 Cal.4th 659, 675; *People v. Majors* (1998) 18 Cal.4th 385, 403.) Beyond itemizing nearly two dozen instances where counsel did not object, Hernandez does not develop any argument as to how these omissions were unreasonable, much less what would overcome the traditional deference due to counsel. Moreover, "[c]ounsel is not ineffective for failing to make frivolous or futile motions." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) Hernandez offers no reason to believe that moving for a mistrial based on the state of the evidence would have any merit. And we frankly do not understand the suggestion that counsel should have "develop[ed] ulterior bases" for Minor's testimony. In any event, we need not evaluate counsel's performance since Hernandez has made no effort to explain how he would have achieved a better result at trial but for counsel's alleged omissions. (*People v. Price* (1991) 1 Cal.4th 324, 440.)

## G. *Prosecutorial Misconduct*

Next, Hernandez asserts the prosecutor committed misconduct. His several claims can be grouped into three categories.

Hernandez primarily contends the prosecutor engaged in improper vouching during closing argument when he: (a) described "catcalling" in a way that deviated from the evidence; (b) argued that Hernandez made adoptive admissions during the pretext call; (c) noted that Minor struggled with her mental health as a result of the abuse; (d) suggested, in the context of discussing Christina Shultz's expert testimony on delayed disclosure of sexual abuse, that Hernandez "groomed" Minor; and (e) indicated that Hernandez prevented Minor's childhood friend Alondra from testifying at trial.

Second, Hernandez argues the prosecutor committed misconduct by introducing evidence at trial that he finds objectionable: "the recordings" played at trial (especially the pretext call), the expert testimony on delayed disclosure of child sexual abuse, and "the hearsay statements, speculation, and statements without foundation elicited by the prosecution."

Third, Hernandez appears to claim that the prosecutor misstated the law in connection with the forcible lewd act offense.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. . . . To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the

29

jury to disregard the improper argument." (*People v. Linton* (2013) 56 Cal.4th 1146, 1205 (*Linton*), internal quotations marks & citations omitted.)

Regarding the first category of alleged misconduct, vouching, Hernandez has forfeited his claim by failing to object during the prosecutor's closing argument. In any event, the contention fails on the merits. "[T]he prosecutor has a wide-ranging right to discuss the case in closing argument. He has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper. Opposing counsel may not complain on appeal if the reasoning is faulty or the deductions are illogical because these are matters for the jury to determine." (*People v. Lewis* (1990) 50 Cal.3d 262, 283.) Nevertheless, the prosecutor may not engage in impermissible vouching, which "occurs when prosecutors [seek] to bolster their case by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it. . . . Similarly, it is misconduct to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness." (*Linton*, *supra*, 56 Cal.4th at p. 1207, internal quotation marks & citations omitted.) "When a claim of misconduct is based on the prosecutor's comments before the jury, . . . the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Id*. at p. 1205, internal quotation marks omitted.)

Here, there was no vouching. The first few remarks challenged by Hernandez are supported by the evidence. The prosecutor stated in closing argument that Minor consistently reported "the touching, the groping, the catcalling, the winking, the blowing kisses," and more. Minor herself used the term "catcall" in describing the beginning of the abuse, and the prosecutor did not elaborate on the meaning of the word. Moreover, for

30

the reasons discussed above, the prosecutor fairly argued that the pretext call contained adoptive admissions given Minor's references to the circumstances of the abuse and Hernandez's failure to deny responsibility or familiarity. And in highlighting all of the reasons the jury should find Minor credible, the prosecutor pointed out that she attended counseling, started wearing baggy clothes, and felt anxious when she heard a truck that sounded like Hernandez's following the abuse. These are all details that Minor discussed in her testimony.

To the extent Hernandez claims the prosecutor wrongly argued that Hernandez "groomed" Minor, the record does not support the contention. On rebuttal, the prosecutor described Shultz's testimony as "eerie." He explained: "She was almost describing [Minor] on some parts, right? Some parts *obviously didn't apply to our case when she's talking about a manipulative, almost-grooming-type relationship. This is obviously not the facts in our case* where this is more of a physically abusive person who's groping and touching somebody like this. [¶] But the things that she was talking about knowing nothing about this case, it was scary how spot on she was." (Italics added.) The record plainly shows that the prosecutor was arguing that this was *not* a case about "grooming."

The last instance of alleged vouching also fails. During her closing argument, defense counsel emphasized that the prosecution did not call Minor's childhood friend Alondra to testify. On rebuttal, the prosecutor maintained: "You heard from Kevin [L.] and [Hernandez's wife] why Alondra wasn't here. Because when Mr. Hernandez was arrested, they went to her house. And they caused such a scene with her and her parents that they forbid her from coming here." This, too, is supported by the testimony at trial. According to Kevin, after Hernandez was arrested, he accompanied

Hernandez's wife to Alondra's house. There was some sort of verbal altercation or confrontation between the wife and Alondra. After that, Alondra's parents forbid her from any involvement in the case. Hernandez's wife admitted on cross-examination that she and Kevin went to Alondra's house, although she claimed that she "simply went there to speak to Alondra's mother to ask whether they knew anything about what was happening," which they denied.

As to the second category of alleged misconduct, the introduction of evidence at trial, we observe that mere "[r]eliance on evidence to prove its case is the function of prosecution and does not constitute the prosecution's use of deceptive or reprehensible methods to persuade the jury." (*People v. Parker* (2022) 13 Cal.5th 1, 74, internal quotation marks omitted.) Other than generally describing the prosecution's evidence as "improper" and recognizing that "[t]he verdicts of guilty in this case would not have occurred, but for the" evidence presented, Hernandez does not explain how the introduction of any piece of evidence was deceptive, reprehensible, or so egregious that it infected the trial with unfairness. (See *id*. at pp. 74–75.)

As to the third claim, Hernandez maintains that "the jury caught" the prosecutor in a misstatement of law "when it requested alternative jury instructions for duress, because using tongue in a kiss is not the something more that is required to meet the element of 'forcible.'" While the argument is difficult to decipher, we understand Hernandez to be suggesting that the prosecutor erred in arguing that "using tongue in a kiss" was sufficient to satisfy the force element in the offense of committing a forcible lewd act upon a child under the age of 14 (§ 288, subd. (b)(1)). As discussed above, that offense required the jury to find, among other elements, that Hernandez "willfully touched any part of a child's body" and that he "used force, violence,

32

duress, menace, or fear of immediate and unlawful bodily injury to the child or someone else" in committing the act.  The jury was instructed that "[t]he *force* used must be substantially different from or substantially greater than the force needed to accomplish the act itself."  (CALCRIM No. 1111.)  In addressing this offense during closing argument, the prosecutor told the jury:

> "So Count 1 – I'll refer to it as the 'the laundry room incident' – is a lewd act with force.  And 'force' is defined for you in CALCRIM 1111 and must be substantially different from – or substantially greater than the force needed to accomplish the act itself.  So when Mr. Hernandez scooped up [Minor] and put his hand under her butt and grabbed the back of her neck and forced her to kiss him, that is why that is a [Penal Code section] 288(b)(1) because that force was substantially different from the lewd act of actually kissing her."

As the record makes clear, the prosecutor did not misstate the law regarding force.  His recitation of force tracked the definition set forth in the jury instruction verbatim.  Assuming that "using tongue in a kiss" is insufficient to constitute force, the prosecutor made no such argument.  Rather, he focused on the facts that Hernandez lifted Minor off the ground by her bottom and held the back of her neck during the kiss, preventing her from pulling away, as she testified at trial.  Thus, Hernandez fails to establish any prosecutor error on the record in this case.

## H.  *Insufficient Evidence*

Finally, Hernandez maintains that insufficient evidence supports his convictions.  He does not contest any particular element of any offense.  Rather, he generally argues that Minor's testimony could not constitute substantial evidence because it was self-contradicting and there were no other witnesses to corroborate her testimony.  Taking into account the governing standard of review, his assertions lack merit.

33

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . . 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' . . . Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction." (*People v. Elliott* (2012) 53 Cal.4th 535, 585, citations omitted.)

The jury was entitled to believe Minor even if no one else testified that they witnessed the abuse. And we reject the notion that her testimony was so contradictory that it was wholly unreliable. In support of this claim, Hernandez highlights two pages of the reporter's transcript that, in his view, show that Minor sought him out and was flirtatious with him. But in those portions of her testimony, Minor explains that she would go alone to lock her mother's car at night to save her siblings from Hernandez's abuse. She then explains that she chose to adopt a "friendly" and "flirtatious" character during the pretext call to "play[] into his story." She decided that expressing vulnerability would "tip him off" because "everything was a joke to him." There is nothing here that necessarily undercuts her testimony about the abuse. Even assuming her testimony contained some inconsistencies, the jury was charged with evaluating the significance of any inconsistencies and determining her overall credibility. (CALCRIM No. 226.) We do not reweigh

34

her credibility on appeal.  Viewing her testimony in the light most favorable to the judgment, as we must, we find it amply supports the jury's verdict.[8]

**DISPOSITION**

The judgment is affirmed.


DATO, J.

WE CONCUR:


IRION, Acting P. J.


KELETY, J.

---

[8]    Appellant seeks judicial notice of two purported facts and propositions of general knowledge:  (1) "human beings are not automatically rational" and (2) "the term 'catcalling' is defined as loud whistles and calls usually made to women usually while they are walking down the street to indicate that they are attractive sexually."  We deny the unopposed motion as unnecessary to our resolution of the issues raised on appeal.  (See *County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 613, fn. 29.)